Laura R. Jacobsen, Esq. (NV Bar No. 13699)
McDONALD CARANO LLP
100 W. Liberty Street, 10th Floor
Reno, Nevada 89501
Telephone: 775-788-2000
Facsimile: 775-788-2020
ljacobsen@mcdonaldcarano.com

Jason C. McKenney, Esq. (TX Bar No. 24070245)
*Pro Hac Vice Application Forthcoming*
Kim Kearns, Esq. (TX Bar No. 24071217)
*Pro Hac Vice Application Forthcoming*
Mavish Bana, Esq. (TX Bar No. 24096653)
*Pro Hac Vice Application Forthcoming*
MAYER LLP
750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
Telephone: 214-379-6288
Facsimile: 214-379-6369
jmckenney@mayerllp.com
kkearns@mayerllp.com
mbana@mayerllp.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MST MANAGEMENT LLC; DENDARY'S DONUTS, LLC; LYON & GREYBEAR LENDING, LLC; and SKYELEE, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CHICAGO DOUGHNUT FRANCHISE COMPANY, LLC; DIVERSIFIED FRANCHISE GROUP, INC., BRIAN PAPPAS; JEFFREY PAPPAS; JACQUELINE BALL; MARK PUBLICOVER; MONTIEDELL "MONTY" MAPLE; BRYAN MORELLE; MARC FREEMAN; RIC McKOWN; and STEVEN MOULTON,<br><br>Defendants. | Case No.<br><br>**PLAINTIFFS' CLASS ACTION COMPLAINT** |

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1

1

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................... 4

II.   JURISDICTION & VENUE ............................................................................... 7

III.  THE PARTIES .................................................................................................. 8

     A.   The Class Representative Plaintiffs ......................................................... 8

     B.   The Defendants ...................................................................................... 10

     C.   Defendant Affiliates ............................................................................. 14

IV.  CLASS ACTION ALLEGATIONS ................................................................. 15

V.   BACKGROUND ON FRANCHISING............................................................ 19

     A.   The Economics of Franchising .............................................................. 19

     B.   The Federal Trade Commission's Franchise Rule ................................ 21

VI.  FACTUAL ALLEGATIONS ........................................................................... 22

     A.   Defendants' Illegal Scheme to Defraud Commenced With the Recruitment of Potential Franchisees.................................................................................. 22

     B.   The FDDs and Their Content Represent an Integral Step in Defendants' Scheme to Defraud Class Members in Violation of the RICO Laws ......................... 35

     C.   The Scheme to Defraud Successfully Induced Class Members to Sign the Uniform and Fraudulent Franchise Agreements, Laying the Groundwork for Their Financial Exploitation .......................................................................... 48

     D.   Defendants Expand the Scheme to Defraud to Lulling Class Members to Remain Within the TDD System, Although Some Begin to Suspect the Truth .......... 53

     E.   Defendants Collect the Scheme's Ill-Gotten Gains by Enforcing Royalty Rights Procured by Fraud and Securing Releases from Locked-In Class Members................ 56

     F.   Defendants' Scheme to Defraud Continues to Attempt to Ensnare More Victims to This Day ...................................................................................... 58

     G.   Defendants' Racketeering Activities Caused Classwide Injury and Damages and Harmed Class Members and Competition ......................................... 59

VII. CLAIMS FOR RELIEF .................................................................................. 64

     FIRST CLAIM FOR RELIEF: Violation of 18 U.S.C. § 1962(c) (RICO Act) .................. 64

     SECOND CLAIM FOR RELIEF: Violation of 15 U.S.C. § 2 (Sherman Antitrust Act: Attempted Monopolization) ........................................................................... 74

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD CLAIM FOR RELIEF – TENTH CLAIM FOR RELIEF: Violation of Nevada Deceptive Trade Practices Act ................................................................... 77-83

ELEVENTH CLAIM FOR RELIEF: Equitable and Remedial Claim for Piercing the Corporate Veil ............................................................................................. 89

VIII.   DEMAND FOR JURY TRIAL ........................................................................ 90

IX.   PRAYER ............................................................................................................ 90

McDONALD ⚭ CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Plaintiffs MST Management, LLC ("Plaintiff TDD Garden City"); Dendary's Donuts, LLC ("Plaintiff TDD Reno"); Lyon & Greybear Lending, LLC ("Plaintiff TDD Dallas"); and Skyelee, LCC ("Plaintiff TDD San Antonio" and, collectively, "Plaintiffs") file this class action complaint on behalf of the putative classes alleged below against Defendants Chicago Doughnut Franchise Company, LLC d/b/a The Dapper Doughnut; Diversified Franchise Group, Inc. ("DFG"); Brian Pappas; Jeffrey Pappas; Jacqueline Ball ("Ball"); Mark Publicover ("Publicover"); Montiedell "Monty" Maple ("Maple"); Bryan Morelle ("Morelle"); Marc Freeman ("Freeman"); Ric McKown ("McKown"), and Steven Moulton ("Moulton" and, collectively, "Defendants") for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO"), the Sherman Act, and the Nevada Deceptive Trade Practices Act ("DTPA") and allege the following.

## I.    PRELIMINARY STATEMENT

1.     The RICO Act imposes criminal and civil penalties on persons who participate in the conduct of an enterprise engaged in a pattern of racketeering activity when that activity proximately causes injury to a plaintiff's business or property.  Racketeering activities, or "predicate acts," include a violation of the federal mail and wire fraud statutes, including through the transmission of misrepresentations, half-truths, omissions, and other conduct in furtherance of a scheme to defraud.  This is the precise conduct in which the Defendants and their fraudulent franchise system, The Dapper Doughnut ("TDD"), have engaged for nearly four years and in which they continue to this engage, defrauding working-class families and small business owners for tens of millions of dollars.

2.     Defendants, the senior executives and management of the The Dapper Doughnut enterprise, conceived of and executed a RICO scheme to fraudulently induce prospective franchise investors and class members into purchasing a TDD franchise and to mislead class members to remain in the so-called TDD System.  The scheme to defraud contained multiple related and continuous fraudulent acts.  First, as part of a franchisee recruitment campaign, Defendants transmitted, or caused to be transmitted, over the mail and wires, communications that constituted illegal predicate acts, including misrepresentations concerning (i) TDD's profitability, (ii) the

4

marginal costs of manufacturing TDD-approved products, (iii) projected revenues for TDD franchises, (iv) the amount of marketing and operational support to be provided by TDD, and (v) Defendants' franchising and business success.  Throughout the high-pressure sales campaign, Defendants reassured Plaintiffs of the truth of these representations based on their decades-long history of success in the franchise industry and induced them to rely thereon, concealing a litany of failed franchises, litigation, and dubious business practices.  Had class members known the truth, they would have refused to sign the uniform franchise agreement.

3.     Defendants also used a Financial Disclosure Document ("FDD") and uniform franchise agreement in order to effectuate the scheme to defraud Plaintiffs.  Pursuant to FTC regulations and various state laws, franchisors are obligated to provide an FDD to any prospective franchisee to provide them with true and accurate information about the franchise to allow for an informed investment decision.  Defendants constantly subverted this process, as found by various state regulators.  Despite an obligation to do so, Defendants routinely failed to disclose material information about TDD's corporate governance structure and its litigation history, made material misrepresentations about the degree of TDD's marketing support to franchisees, and published false financial performance representations lacking any reasonable basis.  Notably, Defendants failed to disclose that a senior manager of TDD's operations (and its first CEO) had a history of government enforcement actions establishing (i) his fraudulent conduct in the franchise industry and (ii) that TDD illegally sought to avoid disclosing that damaging information by surreptitiously moving him to an affiliate.  In short, Defendants, although heavily experienced in the franchise industry, twisted a process intended to promote disclosure of material information to potential investors into a briar patch of outright fraud.  Had class members known the truth, they would have walked away.

4.     There is no doubt that these representations were made with the requisite intent to deceive under the RICO Act.  Defendants cannot escape the fact that, of the roughly one hundred class members, dozens of their franchisees have closed their stores, many others have filed for bankruptcy, and the remainder franchisees teeter on the edge of financial ruin.  These financial results were rapid, sustained, and bore no resemblance to the financial projections provided in the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

recruitment process and in the FDD.  Indeed, the recruitment information provided by Defendants lacked any reasonable basis at all and, therefore, was false when made. One Defendant even informed class members that the financial information provided was inaccurate and that he had heard other instances about TDD employee's lies and deceit from class members.  As further shown by contemporaneous documents, TDD did not provide any of the marketing and operations support that they promised, and were never in a financial position to do so.  Shockingly, these marketing and support representations remain on TDD's corporate website and other marketing webpages to this very day, even though Defendants have admitted in private to be unwilling or unable to satisfy those promises.  The inescapable conclusion is the representations made by the Defendants were fraudulent or made with reckless disregard for the truth and constitute predicate acts through a pattern of racketeering activity.

5.     Class members who signed uniform franchise agreements as a direct result of the scheme invested hundreds of thousands of dollars to build and launch their stores.  This substantial investment financially locked-in them to the TDD System, meaning there was no practical alternative to leaving without losing their investments.

6.     When class members began to realize that the lack of the promised marketing and operational assistance suggested fraud, Defendants would trickle out some half-baked support materials and assure class members that the franchise had turned the corner in order to lull them into remaining in the TDD System and paying royalties.  This "lulling conduct" also violated the mail and wire statutes and constitutes predicate acts part of the scheme to defraud. As a result, Defendants remained free to pilfer royalties and other expenses that they fraudulently procured, even setting up an automatic electronic debiting system from class member bank accounts to easily access their ill-gotten gains.  Defendants wrung every dollar conceivable from the class, openly threatening termination of the franchise agreement and, as a natural consequence, the irreversible loss of most, if not all, of the franchisees' investments.  When class members broke and wanted out of the fraudulent franchise agreement, Defendants made them release all claims against TDD to ensure they retained all of their ill-gotten gains. Such conduct was undertaken in furtherance

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

of, or incident to, an essential part or step to the scheme of defraud and likewise amount to further predicate acts.

7. Defendants' conduct also violated the federal antitrust laws. During the recruitment process and in the TDDs, Defendants represented their policies and practices on the amount of marketing support and on the costs of launching and operating a franchise (including representations about marginal costs). As a result of those representations, class members built their franchise locations and then became locked-in, affording TDD monopoly power. Afterwards, class members learned that TDD's representations were false and that Defendants had changed its policies and practices, despite the fact the class members could not escape the TDD System. As a result, class members lost the value of the promised marketing support and paid supra-competitive prices for equipment, materials, and supplies, thereby causing injury and harming competition. In addition, Defendants misrepresentations, half-truths, and omissions discussed above violated multiple provisions of the Nevada Deceptive Trade Practices Act.

8. Accordingly, Plaintiffs and class members bring these claims to seek compensation, enjoin Defendants' anticompetitive and deceptive scheme to defraud, and subdue any ongoing bad acts so they can begin to close this excruciating chapter of their lives.

## II.   JURISDICTION & VENUE

9. The Court has original question jurisdiction over Plaintiffs' claims arising under the Constitution, laws, or treaties of the United States, including but not limited to, the claims arising under the ("RICO") Act, 18 U.S.C. § 1962, and the Sherman Act, 15 U.S.C. § 2. *See* 28 U.S.C § 1331; 15 U.S.C. § 4.

10. The Court has supplemental or pendant jurisdiction over the state law claims arising under the Nevada Deceptive Trade Practices Act ("NDTPA") that are inextricably intertwined with and related to the legal and factual claims under the RICO and Sherman Acts. *See* 28 U.S.C. § 1367.

11. The Court has general personal jurisdiction over Defendants Chicago Doughnut Franchise Company LLC d/b/a The Dapper Doughnut and Diversified Franchise Group, Inc., because they maintain the same corporate home and principal place of business in this District,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

which is located at 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074.   In addition, DFG and TDD owned, controlled, and/or managed multiple Nevada corporate affiliates in possession of relevant information, including but not limited to, Las Vegas Donut LLC and Vegas Donut Company LLC, which share their principal place of business and corporate home with DFG and TDD at the above addresses.   In addition, the Court has personal jurisdiction over Defendants Monty Maple, Jeffrey Pappas, and Bryan Morelle because they each reside permanently or indefinitely at locations in this District.

12. Because the locus of the conduct giving rise to this class action occurred or otherwise related to this District, there exists an affiliation between the Defendants' conduct and this District.   Therefore, the Court has specific personal jurisdiction over all Defendants.   In other words, personal jurisdiction lies here because the class action arises out of or otherwise relates to each of the Defendants' contacts with this forum.   The specific acts, omissions, or occurrences illustrating this affiliation are alleged below.

13. Venue is proper in this District and the Las Vegas division.   Venue in this District is proper under 15 U.S.C. § 21a and 18 U.S.C. § 1965(a) because one or more Defendants reside, can be found, and/or transact business in this District, including TDD, DFG, Maples, Morelle, and Jeffrey Pappas.   In addition, the uniform franchise agreement for TDD contains a forum selection clause that provides that "any action brought by either party relating to [the Franchise Agreement], any related agreement, the Franchise, or the Franchised Business will be brought in a state or federal court . . . in the county or city in which [TDD's] home office is located."   TDD's and DFG's home office is located at 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074 and is in this District and division.

### III. THE PARTIES

#### A. The Class Representative Plaintiffs

14. **Plaintiff MST Management LLC ("Plaintiff TDD Garden City")** is a limited liability company organized under the laws of the State of Idaho.   Its principal address is 823 N. Paddington Way, Star, Idaho 83669, located near Garden City and Boise, Idaho.   It is owned and operated by Stephanie Hurtado, an Idaho resident, who signed the uniform franchise agreement

1   on July 23, 2018.  Since commencing operations in May 2019, Plaintiff TDD Garden City has yet

2   to turn an overall profit.

3       15.    **Plaintiff Dendary's Donuts LLC ("Plaintiff TDD Reno")** is a limited liability

4   company organized under the laws of the State of Nevada. Its principal place of business is 2440

5   Venezia Drive, Sparks, Nevada 89434. It is owned and operated by Mrs. Jennifer Dendary and

6   Mr. Jeano Dendary, who signed the uniform franchise agreement with TDD on April 7, 2017.

7   Plaintiff TDD Reno was in business for 24 months and closed its doors in March 2020.  It took

8   out hundreds of thousands of dollars of debt to build its storefront in compliance with the uniform

9   franchise agreement and never turned an overall a profit.

10      16.    **Plaintiff Lyon & Greybear Lending, LLC ("Plaintiff TDD Dallas")** is a limited

11  liability company organized under the laws of the State of Texas.  Its principal place of business

12  is located at 1086 Shady Lane Drive, Rockwall, Texas 75087.  In March of 2017, Mr. Juan

13  Leonardo Sanchez executed the uniform franchise agreement with TDD for the right to own and

14  operate a franchised retail location at a mall in Dallas, Texas.  The ultimate retail unit, which was

15  primarily operated by his wife, Ms. Brooke Rogers Sanchez, on a day-to-day basis, opened 13

16  months after signing the franchise agreement on April 16, 2018. It remained open for roughly one

17  year, suffering consistent losses on a monthly basis.  Plaintiff TDD Dallas ultimately went out of

18  business and closed its doors on May 2, 2019.

19      17.    **Plaintiff Skyelee, LLC ("Plaintiff TDD San Antonio")** is a limited liability

20  company organized under the laws of the State of Texas.  Its principal place of business is located

21  at 4515 Bexley Trail, San Antonio, Texas 78259.  Plaintiff TDD San Antonio is owned and

22  operated by Mrs. Celeste Steele-Rodriguez and Mr. David Rodriguez, who signed a Franchise

23  Agreement on July 9, 2018.  Mr. and Mrs. Rodriguez were initially advised by Defendant Jeff

24  Pappas to open a store front. After speaking to other franchisees on the subject, they instead opted

25  for a mini-doughnut catering service.  Currently, Plaintiff TDD San Antonio operates a mini-

26  doughnut catering business as a franchisee and has yet to turn an overall profit.

27

28

9

**B.     The Defendants**

18.     **Defendant Chicago Doughnut Franchise Company LLC d/b/a The Dapper Doughnut ("TDD")** is a limited liability company organized under Florida law on November 9, 2015.  Defendant Brian Pappas and his brother Jeffrey Pappas founded TDD.  Brian Pappas served as the company's first CEO.

19.     TDD sells the right to own and operate a high-end mini donut franchise in a designated market area and the use of TDD's associated trademark.  In exchange, prospective investors and franchisees agree to operate their unit in accordance with standards and specifications of the self-described "TDD System" and to pay upfront franchising fees, ongoing royalties, and other additional fees.  TDD primarily sells two types of franchised units.  The most popular unit purchased by prospective investors is a brick-and-motor retail store operated in malls and commercial centers.  The second most popular unit is the catering-only franchise.  Some retail units also operate a catering business.[1]

20.     TDD is also a wholly owned subsidiary of Diversified Franchise Group, Inc. TDD's home office and principal place of business is located at 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074.  TDD's registered agent for service of process is Starla Hersey, located at 301 East Cochran Avenue, P.O. Box 853, Hastings, Florida 32145.  For purposes of Plaintiffs' RICO claim, TDD functioned as the "enterprise" through which Defendants conducted, participated in, managed, and/or controlled their racketeering activity that caused injury to class members.

21.     **Defendant Diversified Franchise Group, Inc. ("DFG")** is a Delaware corporation formed on January 13, 2016.  It owns a 100% controlling interest in TDD, along with other financial interests in a web of TDD affiliates.  The company's principal place of business is 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074.  DFG's registered agent for service of process is Cogency Global Inc., which is located at 850 New Burton Road, Suite 201, Dover, Delaware, 19904.

[1] The three other franchised units that TDD sold for most of the relevant time period were for food trucks, kiosks, and carts.  These unit-types did not have the level of popularity among investors.

10

22.     Brian and Jeffrey Pappas founded DFG to serve as the parent company of TDD to ostensibly shield and protect the assets of DFG and its owners and directors from the risk of the unlawful conduct and associated legal claims against TDD.  DFG has served as the primary source of funding for TDD by virtue of a series of substantial investments made by Mark Publicover and others, totaling in the millions of dollars.  Multiple Defendants simultaneously have also served as a director, held senior management positions in, and/or performed work for both DFG and TDD during the relevant time period, as illustrated in Figure 1.

**Figure 1**

| Defendant | DFG Positions | TDD Positions |
|---|---|---|
| Mark Publicover | Chief Executive Officer<br>Director | Principal<br>Chief Executive Officer<br>Co-founder<br>Owner |
| Brian Pappas | Chief Executive Officer<br>Director<br>Promoter<br>Consulting General Manager<br>Managing Director | Chief Executive Officer<br>General Manager of Marketing and Operations<br>General Manager<br>Managing Director<br>Co-founder<br>President |
| Jeffrey Pappas | Executive Officer<br>Chief Operating Office<br>Director<br>Promoter | Corporate Secretary<br>VP of Corporate Owned Franchises<br>Managing Director<br>Chief Operations Officer<br>Manager<br>Co-founder |
| Monty Maple | General Manager<br>Senior Vice President | VP of Business Development<br>General Manager<br>Senior Vice President<br>Chief Strategist |
| Steven Moulton | Director<br>Executive Vice President – Legal | Performed business and legal functions on an ongoing basis, such as calculating outstanding royalties, drafting default and termination letters, and collecting royalties. |

23.     Defendant Brian Pappas incorporated DFG and its 100% owned subsidiary, TDD. As noted above, he has served as an original co-founder and CEO of TDD and the CEO and a director of DFG.  In those roles identified in Figure 1, Pappas developed TDD's corporate strategy

and participated in its implementation, regularly travelling to Las Vegas to the corporate headquarters originally located in Las Vegas and then located in Henderson.

24.     Brian Pappas and Jeffrey Pappas are brothers ("Pappas Brothers"), The Pappas Brothers are related by marriage to Publicover, because one of Jeffrey Pappas's son married Publicover's daughter.   The Pappas Brothers secured Publicover's involvement in TDD by obtaining substantial investment capital from him at its outset and additional capital, periodically thereafter.  Brian Pappas currently resides in Jacksonville, Florida.

25.     **Defendant Jeffrey Pappas** and his brother, Brian Pappas, founded TDD as the 100% as owned corporate subsidiary of DFG in 2015 and 2016.   Jeffrey Pappas resides in Henderson, Nevada.  During his time at TDD, Jeffrey Pappas conducted a substantial amount of the enterprise's affairs out of Las Vegas and Henderson.  As depicted in Figure 1, Jeffrey Pappas held various high-ranking positions at TDD, such as the Founding Partner, Chief Operations Officer and Managing Director.  He also held similar roles for DFG.  One of Jeffrey Pappas primary responsibilities was recruiting franchisees into the TDD system.  To that end, working with his brother, Jeffrey Pappas formed and managed a sales and marketing team to support that effort based in Las Vegas.  He worked closely with his brother to, in their words, "create the first mini-doughnut national brand."

26.     **Defendant Mark Publicover** resides in Saratoga, California.   Defendant Publicover provided the initial investment in TDD, through DFG, and made subsequent financial investments, totaling over a million dollars.  Publicover has been a "[p]rincipal" and "co-founder" of TDD since its inception.  He has been the Chief Executive Officer of TDD and DFG and a director of DFG since 2017.  Publicover develops and directs, in his own words, the overall corporate "strategy" and "vision" for TDD.  Publicover implemented his plan for TDD through Maple, Morelle, Freeman, McKown, Moulton, and others, from who he received direct reports about the status of the franchise.  Prior to TDD, Publicover ran a successful business called JumpSport that specialized in the manufacture and distribution of trampoline and trampoline-related products.

12

27.    **Defendant Jacqueline Ball** is the daughter of Brian Pappas.  Ball is the Creative Director and Design Strategist for Sozoe Creative, which is located at 1301 Riverplace Blvd., Suite 800, Jacksonville, Florida 32207.  Ball performed her marketing work for TDD within the ordinary course of her duties with Sozoe Creative and/or its predecessor-in-interest, which benefited from the scheme to defraud by receiving payments from TDD and class members.  During the relevant time period, Ms. Ball served as the Digital Marketing Specialist for TDD on contract with Sozoe and/or its predecessor-in-interest.

28.    **Defendant Montiedell "Monty" Maple** works out of TDD's and DFG's principal place of business at 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074.  Maple joined TDD in 2018 as the Vice President of Business Development and shared responsibilities with Defendant Jeffrey Pappas.  He took over all of those responsibilities after Jeffrey Pappas was terminated for committing fraudulent acts against class members in early 2019.  He reported directly to Publicover.  As part of his job function, Defendant Maple interacted with franchises in numerous respects, including marketing and other operational matters.

29.    **Defendant Bryan Morelle** resides in Las Vegas, Nevada.  Morelle joined TDD in June of 2017 and has been actively involved in all phases of TDD store operations, franchise support, and training.  He is currently the Vice President of Operations and Dapper Doughnut Catering. Among other things, at the direction of and in conjunction with Publicover, Moulton, and others TDD managers, Morelle sought and obtained royalties from class members whose obligation to pay was procured by fraud.

30.    **Defendant Marc Freeman** resides in Fairfield, Iowa.  Freeman took over Maple's job responsibilities in 2019, serving as General Manager of TDD.  He was responsible for all aspects of the franchise system and directly reported to Publicover on a routine basis.  Freeman often communicated with franchisees to apprise them of the leadership team's attempts to reboot TDD and provide consistent marketing and operational assistance.

31.    **Defendant Ric McKown** resides in Northville, Michigan.  McKown served as the Head of Product Development at TDD.  He directly reported to Publicover, having designed trampolines with him previously at JumpSport.  McKown was responsible for operational aspects

of the system, frequently making marketing and operational support representations to class members on an array of topics.

32.     **Defendant Steven Moulton** resides in Saint Louis, Missouri.  Moulton served as the Chief Legal Officer, Executive Vice President, and director of DFG.  He performed important legal and business functions for TDD, as outlined in Figure 1.  Moulton directly reported to Defendant Publicover, with whom he had closely worked at JumpSport.  Moulton was responsible for orchestrating the fraudulent collection of royalties.  In addition, he participated in the creation and maintenance of key corporate franchise documents, such as the iterations of the uniform FDDs and the standardized franchise agreement.

**C.     Defendant Affiliates**

33.     **TDD Supply Company LLC ("TDD Supply Co.")** is an affiliate of TDD with its principal office located at 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074.  It holds itself out as the sole supplier of the approved doughnut fryer, doughnut batter, doughnut shortening, and coffee to the TDD System.  In reality, Lil' Orbits, Inc. supplied the doughnut fryer and doughnut batter.  BakeMark USA LLC supplied the batter later in the time period.

34.     **Las Vegas Donut LLC** was organized under Nevada law in 2016 by Jeffrey Pappas and was an affiliate with TDD.  The entity operated the flagship corporate franchise location in Las Vegas until the store closed in 2019.   Similarly, **Vegas Donut Company, LLC** was organized under Nevada law in 2016 by Jeffrey Pappas and was affiliated with TDD.  Maple served as its manager.  The entity sought to operate additional corporate franchise locations in Las Vegas but was unsuccessful.

35.     **TDD Fulton Center LLC** is an affiliate of TDD formed in 2018, with Defendant Maple serving as the manager.  The purpose of TDD Fulton Center LLC was to operate another corporate franchise in New York City, which after opening in 2018 closed shortly thereafter due to financial difficulties.

36.     **DFG Payroll Company LLC** ("DFG Payroll") was created in March 2016 and is affiliated with TDD and DFG.  Its principal place of business is 1000 N. Green Valley Pkwy. #440-360, Henderson, NV 89074.  It was formed to conceal the substantial involvement of Brian

Pappas in TDD's affairs, after the SEC began investigating him for fraud in connection with the B4K franchise.  The current manager of DFG Payroll is Morelle, who is a Vice President of TDD.

## IV.     CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2), as representatives of a class seeking injunctive relief ("Injunctive Relief Class") defined as follows:  All persons or entities in the United States and Canada who own a TDD franchise or are a party to a currently operative franchise agreement with TDD.

38.     Plaintiffs also bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a class seeking damages ("Damages Class") defined as follows:  All persons or entities in the United States and Canada that are a current or former owner of a TDD franchise from January 1, 2017, through the present.

39.     Plaintiffs also bring this action under Federal Rules of Civil Procedure 23(a) and (b)(3), as representatives of a subclass seeking damages ("Damages Subclass") defined as follows: All persons or entities in the United States and Canada that are a current or former owner of and/or investor in a TDD franchise from January 1, 2017, through the present, that did not release the claims asserted herein and assuming the release is found valid.

40.     The following persons and entities are excluded from the Injunctive Relief Class and the Damages Class and Subclass (together, the "classes" comprised of the "class members"):

(a)     TDD and DFG, including their officers, directors, employees, subsidiaries, and affiliates.

(b)     Corporately owned TDD franchised stores.

(c)     All judges assigned to this case and any members of their immediate family.

41.     The class members are so numerous that joinder is impracticable.  Members of the classes are located throughout the country and number between 60 and 100.

42.     Plaintiffs' claims are typical of the claims of all class members.  Plaintiffs' claims arise out of the same common course of conduct that gives rise to the claims of the other class members.  Specifically, Plaintiffs' claims arise out of an ongoing anticompetitive and deceptive scheme to defraud comprised of related and continuous misrepresentations, half-truths, and

15

material omissions, undertaken by Defendants for the purpose of inducing class members to invest and remain in the TDD System by purchasing a franchised unit, having class members make substantial and irreversible investments into the TDD System such that they were economically locked in to the System, making communications that mislead lulled class members into believing in the strength of the System for the purpose having them remain in the TDD System, and by engaging in conduct in furtherance of that scheme that secured and retained the ill-gotten gains. For this reason, Plaintiffs and all class members were and will continue to be damaged by the same wrongful conduct.

43.     Plaintiffs' claims arise out of the same common course of conduct that gives rise to the claims of the other class members.  Specifically, Plaintiffs' claims arise out of an ongoing anticompetitive and deceptive scheme to defraud undertaken by Defendants for the purpose of inducing class members to invest in the TDD System by purchasing a franchised unit, having class members make substantial and irreversible investments into the TDD System such that they were economically locked in and compelled to make various payments to Defendants for years, and making communications that lulled class members into thinking the franchise system was turning around for the purpose keeping them in the TDD System, and by engaging in conduct in furtherance of that scheme to secure and retain the ill-gotten gains from the misconduct.  For this reason, Plaintiffs and all class members were and will continue to be damaged by the same wrongful conduct.

44.     Plaintiffs will fairly and adequately protect and represent the interests of the classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the classes.

45.     Plaintiffs are represented by counsel who are experienced and competent in litigating class action claims, with particular expertise with antitrust class action and consumer protection class action claims.

46.     Questions of law and fact common to the classes include:

(a)     Whether TDD is an enterprise under the RICO Act.

(b)     Whether TDD is an enterprise under the RICO Act.

(c)     Whether Defendants are employed by or associated with TDD.

16

(d)     Whether TDD engages in or affects interstate or foreign commerce.

(e)     Whether Defendants committed predicate acts in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

(f)     Whether Defendant made financial performance representations and other representations, half-truths, and/or material commissions that lacked a reasonable basis and/or were otherwise false when made.

(g)     Whether Defendant failed to disclosure material facts in the standardized FDDs provided to class members, in violation of the FTC's Franchise Rule.

(h)     Whether Defendants engaged in conduct in furtherance of or incident to the objectives of the fraudulent scheme that constitute predicate acts.

(i)     Whether the alleged misrepresentations, half-truths, and omissions, alone or in combination, were objectively material.

(j)     Whether the alleged misrepresentations, half-truths, and omissions, alone or in combination, were reasonably calculated to deceive a person of ordinary prudence and comprehension.

(k)     Whether Defendants possessed the requisite *mens rea* to violate the federal mail and wire fraud statutes.

(l)     Whether the alleged misrepresentations, half-truths, omissions, and other conduct relating to the racketeering activity were, alone or in combination, was transmitted using the mail or wires.

(m)     Whether the number and nature of the predicate acts demonstrates a pattern and continuity of racketeering activity.

(n)     Whether TDD engaged in predatory or anticompetitive behavior through the campaign of deception against Plaintiffs and class members.

(o)     Whether TDD possessed a specific intent to monopolize the market for locations selling high-end mini donuts to consumers.

(p)     Whether TDD had a dangerous probability of achieving monopoly power.

17

(q)    Whether the deception campaign harmed competition in the relevant market and/or collateral markets.

(r)    Whether the alleged misrepresentations violate the following provisions of the Nevada Deceptive Trade Practices Act: N.R.S. 598.0915(5); 598.0915(7); 598.0915(15); 598.092(5)(b); and 598.0923(2).

(s)    Whether Defendants advertised or offered an opportunity to invest in the TDD System and/or a franchise unit and, in connection thereto, violated the FTC Franchise Rule, in violation of N.R.S. 598.092(5)(f).

(t)    Whether Defendants knowingly violated the FTC Franchise Rule in connection with the sale of TDD franchises, in violation of N.R.S. 598.0923(3).

(u)    Whether the alleged conduct or overall course of conduct caused injury to Plaintiffs and the classes.

(v)    What injunctive and other equitable relief is appropriate.

(w)    What class wide measure of damages is appropriate.

47.    Questions of law and fact common to the Damages Class and Subclass members predominate over any questions that may affect only individual class members, because Defendants have acted on grounds generally applicable to the entire Damages Class and Subclass, including by way of example the standardized FDDs and uniform franchise agreement.

48.    Class treatment is a superior method for the fair and efficient adjudication of the controversy, because, among other things, class treatment will permit a large number of similarly situated persons and/or entities to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

49.    Class treatment also is appropriate under Rule 23(b)(1) and/or (b)(2) because: (a) The prosecution of separate actions by individual members of the Injunctive Relief Class would

18

create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for TDD and the Defendants; (b) The prosecution of separate actions by individual members of the Injunctive Relief Class would create a risk of adjudication of their rights that, as a practical matter, would be dispositive of the interests of other class members not parties to such adjudications or would substantially impair or impede other class members' ability to protect their interests; and (c) TDD and Defendants have acted and/or not acted on grounds that apply generally to the Injunctive Relief Class such that final injunctive relief and/or declaratory relief is warranted with respect to the class as a whole.

50.     Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## V.     BACKGROUND ON FRANCHISING

### A.     The Economics of Franchising

51.     A franchise represents a continuing commercial relationship, in which the terms of the underlying contract contain at least the following:  First, the franchisee obtains the right to operate a business that is identified or associated with the franchisor's trademark.  Second, the franchisor exerts or has the authority to exert a significant degree of control over the franchisee's methods of operation.  Third, the franchisee makes or commits to a required payment, most often the in the form of royalties or franchising fees.

52.     To prevent dilution of the trademark, the franchisor typically imposes operational conditions on the franchisee.  A business format franchise, like TDD or McDonald's, involves the franchisor exerting a substantial degree of control over the franchisee, such as dictating the location and store design, training, compliance with detailed operational manuals and specifications, hours of operation, production techniques, personnel policies, mandatory promotional campaigns, and customer and territorial restrictions.  The TDD System represents a strong version of the business format franchise and provides the franchisor with a substantial degree of control.  For example, franchisees are required to build and operate their business according to standard specifications and franchisor approvals concerning store design and layout;

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

the sale of new products, store construction; use of exclusive suppliers and designated models for equipment; production standards; displays and logos; and minimum expenditures on marketing and advertising.  See Figure 2.

**Figure 2**







53.    As a matter of economics, a franchisee reasonably expects substantial support from the franchisor, commensurate to the fees and royalties required as payment, the degree of operational standards imposed, the degree of independence the franchisee has relinquished, and degree of control the franchisee has entrusted the franchisor with.  This is particularly true for a business format franchise which requires physical presence but for which there are few economies of scale at the level of the franchisee and store.  In contrast, economics of scale exist *at the franchisor level*, including such things like system-wide marketing and brand development, product development, and purchasing and operational methods that can be done in one location but benefit all franchisees.  Therefore, it is economically rational for the franchisor to willingly

offer substantial operational support in a strong business format franchise, and for the franchisee to expect such support.

**B.      The Federal Trade Commission's Franchise Rule**

54.      The franchising industry is regulated by the Federal Trade Commission ("FTC") and state franchise and securities enforcement agencies.  The FTC and states require franchisors to create a Franchise Disclosure Document ("FDD") that discloses material information about the franchise and to provide the FDD to prospective investors before the execution of a franchise agreement.  The set of relevant FTC's rules are known as the "Franchise Rule." [2]   The Franchise Rule was issued for the central purpose of preventing fraud and deceptive practices in the offer and sale of franchises.[3]   The omission of information—or not wholly accurate representations—is material where the representation or omission of information would likely affect the individual's decision to purchase a franchise.[4]

55.      The Franchise Rule requires the written disclosures in the FDD to be solely in the format set forth in the revised Uniform Franchise Offering Circular Guidelines adopted by the North American Securities Administrators Association ("NASAA") ("the Guidelines"), with subsequent authoritative interpretations and application of the Franchise Rule published.[5]   The FDD must be updated on a quarterly or annual basis and be submitted for approval to state franchise regulators.[6]   In drafting an FDD, the franchisor must "[r]espond fully to each disclosure Item . . . clearly, legibly, and concisely . . . using plain English."[7]

---

[2] *See* 16 C.F.R Parts 436 and 437 (2007).  The Franchise Rule and its state law counterparts require disclosure of information pertaining to certain "Items" relating subject matters about the franchisor-franchisee relationship.

[3] 72 Fed. Reg. 15444, 15445 (Mar. 30, 2007).

[4] *Id.* at 15455; *see id.* at 15448.

[5] *Id.* at 15499 (The "staff [shall] coordinate the issuance of Compliance Guides, and future interpretations of [the Rule], with NASAA's Franchise and Business Opportunity Project Group in order to minimize differences between FTC and state Rule interpretations.").

[6] 16 C.F.R. § 436.7(a) (requiring annual update), § 436.7(b) (quarterly update required to disclose material changes).

[7] *Id.* at § 436.6(b)-(c).

McDONALD ⚜ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

# VI.  FACTUAL ALLEGATIONS

**A.  Defendants' Illegal Scheme to Defraud Commenced With the Recruitment of Potential Franchisees**

56.     "[T]he story" told in TDD's marketing documents is that in 2016 "[f]ranchising veterans Brian and Jeff Pappas . . . teamed up with Beavers Donuts co-founders Sam Weisen and James Nuccio to launch an aggressive national and international single and multi-unit owner franchise program targeting upscale, high volume malls in major cities across the U.S., catering opportunities[,] and the development of several strategic corporate-owned locations in Las Vegas casinos."  The "management" section in identifies Nuccio and Wiesen as the "concept developer[s]" and Publicover as "Principal."

57.     The partnership with Wiesen and Nuccio of Beavers Coffee & Doughnuts ("Beavers") involved Beaver's providing consulting over concept design, TDD acquiring Beavers business property, and rebranding of Beavers' locations to TDD.  Beavers was an independent mini donuts operation based solely in Chicago.

58.     Overall, Brian Pappas and Jeffrey Pappas pitched TDD's to prospective investors based on the proposition that TDD represented a high-upside and rapid growth business opportunity.  Defendants touted the franchise as an upscale consumer experience, providing customers with the unique opportunity of watching the entire donut creation process and the pleasure of a high-end product.  Prospective investors were provided high-end renderings of an upscale TDD franchised retail location, as shown in Figure 3.

///
///
///
///
///
///
///
///

**Figure 3**



59.     As Chief Operations Officer, Jeffrey Pappas worked in conjunction with his brother, the Chief Executive Officer Brian Pappas, to lead a team of franchise salespersons and brokers, who at their direction, engaged in the marketing and sales of franchise units.  Often, class members learned about TDD while conducting due diligence on potential investment opportunities, such as doing online research and encountering a request for information webpage or TDD advertisement.   After clicking the link, the potential investor provided personal information to TDD to express their interest.  Thereafter, Defendants would quickly commence an aggressive recruitment campaign, marred by fraud and amounting to a RICO scheme to defraud, to persuade typically working- or middle-class individuals into actually investing their money into a high-end mini donut franchise.

i.     ***The initial financial performance representations were false and misleading.***

60.     As part of the deceptive marketing campaign, class members received uniform emails and telephone calls from Brian and/or Jeffrey Pappas or their agents on the sales team. These initial communications highlighted two material aspects of owning a TDD franchise: profitability and costs.  These representations were deliberately false and mostly made by Jeffrey Pappas and his team of salespersons located in Las Vegas.  Had class members known the truth about one or more of the false statements, they would never have signed a franchise agreement.

23

61.     In particular, Defendants repeatedly emphasized that TDD was one of the most profitable franchises on the market. For example, in December 2016 Jeffrey Pappas incessantly called Plaintiff TDD Dallas in the early stages of the recruitment process to emphasize that a retail unit could earn "***30% to 40% profits***," and that 30% could be achieved "***without trying***," with Plaintiff TDD Dallas achieving "***a return of investment six months after the store opened***." Additionally, in response to an information request, on January 1, 2018 Jeffrey Pappas untruthfully told Plaintiff TDD San Antonio via email that "The Dapper Doughnut franchise is one of ***the most profitable businesses on the market today***."  Similarly, on August 27, 2018, Brian and Jeffrey Pappas quickly responded to Cafe Dew's ("TDD Houston") request for information with a standardized marketing email claiming that "***the combination of donuts and coffee is literally the most profitable [food and beverage] combo on the planet.***"

62.     In addition to the misleading profitability predicate acts comprising part of the scheme to defraud, Jeffrey Pappas went as far as to create a more detailed fraudulent financial forecast for a prototypical TDD store and emailed it to class members.  The materials contained Microsoft Excel files reflecting sales and costs, including monthly and annual income statements, for a retail unit.  Leaving no doubt as to authorship, each financial performance Excel sheet stated, "The Dapper Doughnut."  Jeffrey Pappas transmitted these financial performance representations to Plaintiff TDD Dallas on or about February 15, 2017, predicting total revenue for the next five years.   On March 11, 2018, he emailed *the very same set of projections* to Plaintiff TDD San Antonio.[8]

///

///

///

///

///

///

---

[8] On November 10, 2016, Jeffrey Pappas likewise emailed Plaintiff TDD Reno a substantially similar forecast in the same format projecting the first year of a franchise, with *even higher revenue numbers* than his Auntie Anne's projections.

24

**Figure 4**

## The Dapper Doughnut

| Projected Income Statement | | | | | |
|---|---|---|---|---|---|
| For the Period Ending, | FY16 | FY17 | FY18 | FY19 | FY20 |
| **Revenue** | | | | | |
| Food | $  567,840 | $  584,875 | $  602,421 | $  620,494 | $  639,109 |
| **Total Revenue** | 567,840 | 584,875 | 602,421 | 620,494 | 639,109 |

63.     These projections were based on revenues earned by a single Auntie Anne's Pretzels franchised unit in a Dallas mall and lacked a reasonable basis.  Based on the original Auntie Annie's numbers, Jeffrey Pappas extrapolated gross revenue, costs, profitability, and numerous material financial metrics for over a five-year period.  However, financial projections based on a single year of performance of an ***established franchise are not germane to an upscale start-up dessert franchise whose primary product was a mini donut.***  In sharp contrast to TDD, however, Auntie Anne's sells hot pretzels day as a snack, for lunch, or for dinner, and its franchises are supported by a franchisor that has operated continuously for over thirty years and has superior brand awareness.  For these reasons, no reasonable basis existed to use the Auntie Anne's numbers as a basis to project financial performance of TDD in any context.  Therefore, these financial performance representations were false when made.

64.     These financial performance representations (and the preceding profitability statements) were also false when made based on the real-world evidence of dismal financial performance of franchisees alone and relative to TDD's representations.  At least a dozen, and likely more, class members closed their TDD stores ***within a year of opening*** due to extremely poor financial performance.  Others had to file for bankruptcy.  The entire class suffered and continues to suffer on the edge of insolvency after experiencing the ***rapid, steep, and persistent losses***.

65.     To illustrate, the Auntie Anne's forecast provided to class members predicted a net profit of $41,496.00 per month.  In contrast, Plaintiff TDD Dallas suffered annual net losses greater than $60,000, a $630,000 difference from Jeffrey Pappas' financial performance

25

representation.  TDD Houston struggled to make an average a net profit of just $156 over a seven month period.  In fact, not a Plaintiff has recouped the investments they made to date.  As TDD St. Louis commented, "[a]t what point do we *shut this franchise down and spare all of the owners from filing for bankruptcy and/or losing their investment*," noting that "*locations are closing at an alarming rate*" as a result of "this *charade and inept leadership team*."

66.     Furthermore, TDD's corporate stores also collapsed, corroborating the proof from class members. The corporate store in New York City closed after *just six months* in late 2018-2019.  The flagship corporate store in Las Vegas imploded too after losing a single catering contract. The *dramatic, rapid, and perpetual* poor performance of the class members, as compared predictions of financial performance representations, indisputably demonstrates that the representations were false when made and made with a conscious disregard for the truth.

67.     Further still, TDD's own employees have confirmed the misleading nature of the financial performance representations made by the Pappas Brothers, as part of the scheme to defraud.  In 2019, after Jeffrey Pappas's employment was terminated for his fraudulent conduct, Maple held discussions by phone class members where he apologized for Defendants' misconduct and offered to discuss *realistic numbers* for their stores.  In other words, Maple admitted that Defendants' financial performance representations *were wholly unreliable*.  Maple went on to inform Plaintiff that other franchisees had similarly relied on the Pappas Brothers' lies and deceit.

68.     Additional evidence from Defendants supports a reasonable inference of fraud. Defendants represented they collectively possess over 60 years of experience in the franchising, distribution, and food and beverage industries in their sales and marketing materials, as well as in FDDs, trainings, and franchise manuals.  With that level of experience, Defendants appreciated the financial performance representations' materiality, impossibility, and falsity.  Defendants nonetheless made those representations, knowingly or with conscious disregard of the truth, comprising a series of predicate acts constituting an illegal scheme to defraud.

*ii.*     ***TDD's initial costs representations were false and misleading.***

69.     Also part of the scheme to defraud, during the initial recruitment process, Defendants also made represented by email to class members that a TDD franchise was a low-

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

cost investment.  On January 1, 2018, Jeffrey Pappas sent an e-mail to Plaintiff TDD San Antonio explaining that TDD was "one of least expensive franchises" available.  The basis for this representation: that the "mini donut recipe is incredibly low cost (about $0.03) to make and we sell them for from $.30 to $1.00."  On August 27, 2018, a standardized marketing e-mail from the Pappas Brothers also informed TDD Houston that "[t]he food cost to make one donut is around $0.03 and we sell them from $.30 - $1.00!"  A similar communication was made by e-mail to the TDD franchise in The Woodlands, Texas in June 2018 by the TDD sales team (at Jeffrey Pappas' direction).  Pappas repeated this false and fraudulent mantra to Plaintiff TDD Dallas in December 2016 and thereafter by telephone.  Similar representations were made by phone or e-mail to Plaintiff TDD Reno in the same time frame.

70.     These representations conveyed a misleading impression about the products TDD approved for sale and the marginal costs associated with producing those products.  However, TDD does not authorize the sale of a single mini doughnut. The product line instead includes six doughnuts in TDD approved packaging, a twelve-doughnut packs, and a twenty-four-doughnut packs.  These material facts remain omitted from the recruitment representations concerning costs, which further omitted the existence of additional material marginal costs, such as doughnut toppings, frying oil, and the TDD approved packaging boxes.  In short, the $0.03 figure merely covers the cost of the doughnut mix.  Figures 5 and 6 depict the Pappas Brothers representations concerning marginal costs and anticipated pricing compared to *actual* pricing and marginal costs for Plaintiff TDD Garden City and other franchisees.

**Figure 5: 6 Pack Marginal Costs and Pricing**

|  | **Doughnut Mix** | Total Cost with Toppings | 6 Pack Packaging | 6 Pack Actual Cost | Retail Price[9] |
|---|---|---|---|---|---|
| Hypothetical | **$0.03** | Omitted | Omitted | Omitted | $1.00 |

_____

[9] Internal TDD documents recommend that franchisees attempt to sell each doughnut in a box at around $1.00.  Most franchisees comply with this recommendation.

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

| | Doughnut Mix (Pappas) | Total Cost with Toppings | 12 Pack Packaging | 12 Pack Actual Cost | Retail Price |
|---|---|---|---|---|---|
| Single Doughnut (Pappas) | | | | | |
| 6 Pack<br>3 S'Mores<br>3 Blueberry Lemmon | $0.18 | $0.34<br>$0.37 | $0.56 | **$1.27** | $4.99 |

**Figure 6: 12 Pack Marginal Costs and Pricing**

| | **Doughnut Mix (Pappas)** | Total Cost with Toppings | 12 Pack Packaging | 12 Pack Actual Cost | Retail Price |
|---|---|---|---|---|---|
| Hypothetical Single Doughnut (Pappas) | **$0.03** | Omitted | Omitted | Omitted | $1.00 |
| 12 Pack<br>3 S'Mores<br>3 Blueberry Lemmon<br>3 Fluffer Nutter<br>3 Loco Coco | $0.36 | $0.34<br>$0.37<br>$0.30<br>$0.26 | $0.85 | **$2.12** | $7.99 |

71.     Surely, at the time Defendants made the material cost misrepresentations concerning the costs of producing donuts, they had already developed their business plan and product concepts for TDD and would have already calculated the actual costs of producing the donut products TDD sold.  The business and consulting relationship with a more established operator like Beavers existed to work out this very issue, and Defendants had written multiple FDDs detailing a franchisee's operating costs (as required under the Franchise Rule).  As such, there is ample reason to believe that the marginal cost representations were knowingly false when made or made with a conscious disregard for the truth.

iii.     ***At Las Vegas Discovery Days, Defendants deceived class members to believe they would provide 24/7 marketing and operations support.***

72.     Defendants required prospective franchisees to attend a "Discovery Day."  Usually in Las Vegas every several months, Discovery Days were hosted at TDD's corporate offices, where the attendees discussed the alleged franchising success of the Pappas Brothers, the types of

1    TDD units, marketing efforts, training, and other types of franchise support.  The attendees also

2    visited the corporate store at the MGM Resort & Hotel and tasted products.  Discovery Days were

3    most often attended by Brian Pappas, Jeffrey Pappas, and Morelle, as well as by Sammi Weisen.

4    The Pappas Brothers were responsible for the content of Discovery Days, and Jeffrey Pappas

5    and/or his assistant Christina Salaazar (at his direction) made presentations to the attendees.

6          73.    As discussed above, when a franchisor wishes to have substantial control over the

7    operations of the franchisee and demands periodic payment of royalties, an economically rational

8    outcome would be for the franchisor to provide continuous marketing support and operational

9    assistance.  Therefore, it is unremarkable that for substantial portions of Discovery Day the Pappas

10   Brothers made specific representations to Plaintiffs and class members about the substantial

11   support they would receive if they joined the TDD System.  These representations were deceptive

12   false when made, and had the truth been revealed, it would have caused class members to forego

13   the franchise agreement.

14         74.    At Discovery Days, the Pappas Brothers consistently and uniformly conveyed, or

15   caused to be conveyed, to class members that they would receive marketing support 24 hours a

16   day, 7 days a week.  This promised marketing assistance would include new e-mail blasts to send

17   customers, new Facebook advertising templates, contemporaneous marketing brochures for in-

18   store use, and regular mailings, among other marketing tools.  This steady stream of marketing

19   materials would come at no extra cost (because they were covered by the franchising fees) and

20   would be provided by an outside consultant, Jacqueline Ball (Jeffrey Pappas's daughter).  In short,

21   Defendants painted the false impression that there would be a full marketing team at the

22   franchisees' disposal.

23         75.    These deceptive acts were made during the (1) September 13, 2018 Discovery Day

24   to TDD Houston in Las Vegas, (2) the July 10, 2018 Discovery Day to TDD The Woodlands in

25   Las Vegas, (3) the March 2018 Discovery Day to Plaintiff TDD San Antonio in Las Vegas, (4)

26   the June 14, 2018 Discovery Day to Plaintiff TDD Garden City in Las Vegas, and (5) the January

27   18, 2017 Discovery Day to Plaintiff TDD Dallas in Chicago.   These misrepresentations not only

28

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

1   gave this uniform impression to all class members that attended Discovery Day (and all were

2   required), but to class members in subsequent communications by Defendants as well.

3          76.     Similar misrepresentations occurred concerning the nature and frequency of the

4   operational assistance from TDD.  At the Discovery Day attended by Plaintiff TDD San Antonio,

5   Defendants represented that franchisees would receive continuous updates concerning the

6   marketing and operations manual, recipes for doughnut flavors, and TDD's exclusive vendors,

7   with a hotline to address questions, among other things.  Defendants did not indicate that

8   franchisees would be charged extra fees for these services.  The same misrepresentations were

9   made to Plaintiffs TDD Dallas, TDD Garden City, and TDD Reno, as well as TDD Houston,

10  during their Discovery Days.  In fact, these misrepresentations were made uniformly to class

11  members during Discovery Days and in subsequent communications made by Defendants.

12  Defendants' representations of 24/7 marketing support and consistent operational support were

13  false when made.  After executing its franchise agreement, in 2018 Plaintiff TDD San Antonio

14  accessed TDD's intranet system, Naranga, to review the supposedly updated flow of marketing

15  materials.  However, ***the marketing materials were out of date and had not been updated since***

16  ***2017***.  Neither Plaintiffs nor class members received any consistent marketing or operational

17  support.  Where an individual act (or fails to act) in a manner inconsistent with a recent

18  representation, the timeline of events provides a reasonable inference that the representation was

19  false and made with an intent to deceive.  So too here.  That inference is bolstered by the fact

20  Defendants knew at the time that they made the representations that, on paper, TDD was severely

21  under-capitalized and experiencing annual losses that would render it unable to provide the

22  promised support.

23         77.     In addition, class members' documents provide compelling contemporaneous

24  proof of the complete absence of support and assistance from TDD.  For example, in a September

25  27, 2019 e-mail with Maple, TDD Houston clearly explained how Defendants' promises of

26  assistance had fallen woefully short:

27          [N]o one from corporate had given us ***any proper responses or support,***
            ***let alone be here for our opening as were told during training and***
28          ***numerous times before and after that***.  It took us weeks to figure things

out for ourselves with *almost zero response and guidance* from TDD . . . . *To this date, our website, menus and so many marketing needs have not been met at all.*  We have reach[ed] out and communicated with everyone from TDD that we possibly could with **no real results yet**."

78.     In addition, another franchisee emailed class members and management in December of 2019, noting that class members had "be[en] paying $1,000 a month in 'royalties' for the 'services' that our corporate team provides," but that he had personally received zero support."  In short, "this is NOT what franchises do and not the support/guidance we should expect."  As another franchisee similarity remarked, "The lack of support in all areas regarding marketing and communications is horrible.  Had I known 2 years ago when we signed on that this would be the worst decision of our lives, we never would have done it."  Plaintiff TDD Garden City also e-mailed to express her concerns about the lack of promised assistance and support. Plaintiff explained that "I chose to go with a franchise for the support that franchises offer but at this point there has been no support.  I have worked on [management's] side for three different franchises as a General Manager, Corporate Trainer, and Multi Unit Director.  I have seen the good, the bad, and the ugly and by far this is the ugliest I have ever seen."

79.     In January 2020, TDD Las Vegas Food Truck emailed corporate management and class members, noting with disbelief that "I have not seen one new marketing resource for the entire 8.5 months since I started. . . . That is not what I was promised and shown during the introduction to the company and during training.  Then we start and it seems to have stopped the very first month we are on."

80.     Defendants own conduct and documents makes plain the falsity of their marketing and support assistance representations.  In early 2019, Maples visited class members to apologize for the wrongdoing of the Pappas Brothers.  Maple also commented that cleaning up the mess could take months, referring to the present lack of marketing and operational support.

81.     Tellingly, TDD documents reflect that attempted clean-up work, including the deficient levels of support that had existed before.  In November 2019, for instance, McKown acknowledged that "certain items [on Naranga] have not been updated."  Two months later Freeman admitted that TDD still could not provide 24/7 marketing support, conceding that "[w]e are looking into what we can do for you with marketing."

31

82.     Lastly, an e-mail exchange between Publicover and class members in late 2019 demonstrates that the false support and assistance representations were knowingly or recklessly made and comprised a scheme to defraud.  For instance, TDD Delaware stated that "[w]e [have been] complaining" about TDD's failed support and assistance "from day one," noting that "they had lied about everything.  And then steps in Monty with all the promises. REALLY UPSET WITH CORPORATE AND THEIR FALSE PROMISES TO DATE."  In short, "zero support at every angle is ridiculous."

iv.     ***Defendants also provided deceptive financial performance representations at Discovery Day.***

83.     At the September 13, 2018 Discovery Day held in Las Vegas, Jeffrey Pappas and Morelle provided TDD Houston and other class members misleading financial performance representations for a hypothetical retail store in the TDD System, entitled "TDD MOTHLY PROJECTIONS: HEALTHY STORE."  The same or similar financial performance representations were provided before and after additional Discovery Days in at least 2018 and 2019.  See Figure 7 below.

**Figure 7: Excerpt of Healthy Store Projections**



McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

84.     Just like the Auntie Anne's financial performance representations, discussed above, the "healthy store" projections were devoid of a reasonable basis and false.  The projections state that the "[percentages are] based on industry standard for fast casual dining outlet."  That's it.  There is no substantiation whatsoever for the top-line revenue figure, which is not percentage based.  No specific source is cited for the percentage line items.  Nor does the forecast explain why a broad benchmark of fast casual dining restaurants, which often serve lunch and dinner, represented an appropriate benchmark for a high-end mini doughnut desert franchise.  To the contrary, comparing a "healthy store" in a niche, start-up franchise to such an "industry standard," as noted curtly in the document, represents a gross distortion of reality.[10]

85.     The "healthy store" financial performance representations were likewise fraudulent or recklessly made.  The poor, rapid, and persistent underperformance of class members, as compared to the "healthy store" projections belies any notion of good faith.  The precipitous timing and similar results across the class compels the conclusion that Defendants knew that the financial performance representations were false when made or recklessly disregarded the truth.  Maple's commentary on the fraudulent nature of the Pappas Brothers and their financial performance representations only bolsters the point. [11]

v.      ***Defendants conceal material facts about their fraudulent and bankrupt business ventures as part of their scheme to defraud.***

86.     Defendants trumpeted the amount of their success in the franchising and food and beverage business industries during the recruitment and sales process to all class members.  An

---

[10] The "healthy store" projections spawned a series on financial misrepresentations   At the June 14, 2018 Discovery Day held in Las Vegas, Jeffrey Pappas represented to Plaintiff TDD Garden City that a typical retail unit would generate $30,000 in gross revenue a month, consistent with the supposed "healthy store" projections presented in Figure 7.  In addition, Jeffrey Pappas further assured attendees they would make more than enough in gross revenue such that 5% of their sales would "vastly" exceed the $1,000 in mandatory minimum royalties owed per month and instead attendees would be able to pay the alternative 5% of sales in royalties.  This representation too was in accord with the "healthy store" projections, because 5% of the $30,000 of projected monthly revenue in Figure 7 equals $1,500 in royalties a month, which is greater than the minimum royalties.

[11] Indeed, TDD's corporate website represents that "The Dapper Doughnut management team has over 60 years of food and beverage and over 30 years of franchising experience."  *See* https://thedapperdoughnut.com/franchise/ (last visited Dec. 21, 2020; Feb. 22, 2021).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  illustrative example is shown in Figure 8 below.  For example, on Mach 24, 2017, Jeffrey Pappas

2  sent by e-mail to Plaintiff TDD Dallas a presentation that misled it into believing that the Pappas

3  Brothers were successful in the franchise and food and beverage industries.

**Figure 8: Business History Biographies**

# MANAGEMENT



**BRIAN PAPPAS**
CEO
Brian has been a franchise developer for over 35 years. From July, 2010 to July, 2015 he was the CEO of St. Augustine, Florida-based Creative Learning Corporation (OTCQX:CLCN), owner and developer of Bricks 4 Kidz,® and Sew Fun Studios®, the highly-popular children's education and enrichment programs. Brian founded BFK Franchise Company, LLC, d/b/a Bricks 4 Kidz, in May of 2009 with only $50,000 and since then BFK has awarded over 700 Bricks 4 Kidz franchises in 40 countries, generating over $22 million in revenue and $4 million in pre-tax profit. Bricks 4 Kidz was awarded the #1 Children's Franchise by Entrepreneur Magazine and is ranked #88 internationally by Entrepreneur Magazine, and has become one of the fastest growing franchises in the world. This all occurred while Brian was CEO of Creative Learning Corporation.



**JEFF PAPPAS**
VP of Corporate Owned Franchises
Over 30 years of experience in the service, food and beverage industry. His experience ranges from developing new fast food concepts to operating high end restaurants. Co-founder of Evening Call daiquiri bars located in Las Vegas casinos at Mandalay Bay, Luxor, Bally's. Jeff also has been a national and international franchise development director for a number of brands.

16      87.      However, Defendants failed to disclose material facts that would have avoided

17  such statements becoming actionable half-truths and omissions.  First, Defendants knowingly

18  failed to disclose the material fact that a franchise system operated by Brian Pappas filed for

19  bankruptcy and was liquidated in 1997.  Second, Defendants knowingly failed to disclose the

20  material fact that Brian Pappas filed for personal bankruptcy and was granted a general discharge

21  in 2004.   Third, Defendants knowingly failed to disclose the material fact of their direct

22  participation in sham and undisclosed related-party transactions in their prior franchise system,

23  B4K. Lastly, Defendants knowingly failed to disclose the material fact that the SEC was

24  investigating Brian Pappas for fraudulent conduct at B4K, as discussed in greater detail below.

25  Had the franchisees known the reality of Defendants previous conduct, they would not have

26  entered into the franchise agreement.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

34

**B.     The FDDs and Their Content Represent an Integral Step in Defendants' Scheme to Defraud Class Members in Violation of the RICO Laws**

88.     As explained above, Defendants are required to provide a FDD to prospective franchisees, which includes material, required disclosures to facilitate prospective franchisees' decision to invest in the franchise.  The disclosures mandated in the document are highly regulated by the FTC's Franchise Rule and laws of various states that supervise franchises, such as Washington and Virginia.  The primary purpose of the FDD is to prevent fraudulent and deceptive practices in the offer or sale of franchises.

89.     Constituting a central corporate document, the FDD was carefully developed and drafted by the senior officers of TDD and DFG.  Generally speaking, Brian Pappas (CEO), Jeffrey Pappas (COO), Publicover (CEO), Maples (Executive VP) and/or Moulton (Executive VP) developed, drafted, and/or caused, on their own accord or at the behest of one or more of the group, the FDDs to be distributed to prospective franchisees for the purpose of inducing them to sign the uniform franchise agreement and invest in the TDD System.  Due to Defendants substantial experience in the franchise industry and food and beverage industries, they possessed significant knowledge of the Franchise Rule's disclosure requirements and relevant industry Guidelines.  Accordingly, the misstatements and material omissions alleged below were knowingly made or made with a reckless disregard for the truth.

90.     Without the benefit of discovery, Plaintiffs have located four FDDs.  Each one contains myriad material misstatements, half-truths, and omissions that are inter-related and mirror prior misstatements in FDDs, forming an integral part of the anticompetitive scheme to defraud.  In particular, the FDDs contain four categories of misstatements, half-truths, and omissions that are part of the scheme to defraud: (1) misstatements and half-truths concerning corporate governance; (2) omissions concerning fraud-related litigation; (3) marketing misrepresentations; and (4) financial performance misrepresentations.  Had Plaintiffs and class members known the truth about one or more of the misleading statements, they would not have signed the franchise agreement.

*i.     __The July 5, 2016 FDD.__*

91.     Plaintiff TDD Dallas received the July 5, 2016 FDD from Brian Pappas by e-mail

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

around December 2006.  Plaintiff TDD Reno received the FDD from Jeffrey Pappas by e-mail in late 2016.  In addition, prospective franchisees and future class members received this version of the FDD by email until TDD updated it by law.[12]

92.     Item 1 requires disclosure of the franchisor and any predecessors or affiliates, as well as information about their business.[13]  Under Item 1, Defendants failed to disclose the affiliate TDD Holding Company LLC ("TDD Holding"), which was formed in May 2016 to locate and operate a corporate franchise location, a goal it never achieved.   According to the 2019 FDD, TDD Holding also provided consulting and other services to Las Vegas Donut LLC and other TDD affiliates.  Defendant did not include information on TDD Holding's this "prior business experience" or other.[14] Thus, Defendants obscured the fact that an affiliate had not been successful in its endeavor, a fact that could have undermined a prospective investor's confidence in the TDD System.  Defendants also concealed the existence of an affiliate that performs services for two other TDD affiliate, drawing attention to the spider-like web of TDD affiliates companies and the concomitant risk of sham related-party transactions and poor corporate governance.  A reasonable prospective franchisee would want to know the omitted information before investing in TDD, and therefore the omission was material.

93.     Under Item 1, Defendants also failed to disclose the existence and nature of DFG Payroll, which multiple TDD financial statements call "an affiliate."  DFG Payroll was created in March 2016 and was later used to create the false impression that Brian Pappas no longer worked as an executive for TDD and instead worked at a different company as its General Manger.  Defendants ultimately intended to prevent disclosure of Brian Pappas under Item 2 and the SEC's 2015 investigation and subsequent litigation in 2017 regarding the B4K franchise under Item 3.

94.     The FTC itself has emphasized the importance of litigation disclosures in rooting

---

[12] 16 C.F.R. § 436.7(a) (requiring annual update), § 436.7(b) (requiring quarterly update for disclosing material changes).

[13] *Id at* § 436.5(a)(1).

[14] *Id at*. § 436.5(a)(1), (7). 16 C.F.R. § 436.7(a) (requiring annual update), § 436.7(b) (requiring quarterly update for disclosing material changes).

[14] *Id at* § 436.5(a)(1).

[14] *Id at*. § 436.5(a)(1), (7).

out fraud.  In the Statement of Basis and Purpose for the Franchise Rule, the FTC made clear that litigation disclosures reflected highly relevant information that could "remedy misleading success claims" made by franchisors.  The FTC further elaborated that full disclosure of "[t]he existence of such lawsuits is material because this information would likely influence a prospective purchaser's decision about what can be a sizable investment in a franchise or a business opportunity.  The nature of the relations between the seller and the purchaser, as reflected in litigation, is of central importance."[15]  For these reasons, the non-disclosure of DFG Payroll was material.

95.     Item 2 requires the disclosure of the directors, principal officers, and any individual who will have management responsibility relating to franchise sales or operations and their business experience.[16]  Here, Defendants misrepresented "the prior business experience" of Jeffrey Pappas with his role in the B4K franchise during the time his brother served as its CEO.  The FDD curtly states he merely served as a "broker for BFK," fostering the impression of legitimacy.  Defendants, however, concealed that Brian Pappas paid over $600,000 in bogus "commissions" to his brother during their time at B4K, transactions the SEC subsequently found fraudulent and undisclosed related-party transactions.[17]  A reasonable investor would want to know that the Pappas Brothers had a history and practice of poor corporate governance practices and engaging in related-party transactions that siphoned funds away from the franchise to the detriment of franchisees.

96.     Defendants also ignored the express and obvious requirement to disclose the names of all of TDD's directors.[18]  The Board of Directors monitors and selects corporate management, and their role in a healthy company's corporate governance structure is well-recognized as critical.  For instance, it would be reasonable for a prospective investor to want to know whether the board

---

[15] 72 Fed. Reg. 15444-15451.

[16] 16 C.F.R. § 436.5(b).

[17] Compl. for Injunctive Relief and Other Relief, *United States Secs. & Exch. Comm'n v. Brian Pappas, et al.*, Civ. Action No. 3:17-cv-954, at pp. 6-10 (M.D. Fl. Aug. 21, 2017).

[18] 16 C.F.R. § 436.5(b).  TDD's financial statements make clear that there are monetary transactions between TDD and "directors."

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

was comprised of individuals beholden to Brian Pappas and Mark Publicover or, in the alternative, had independent directors.[19]   These omissions are material because they do not provide a reasonable investor important information about the corporate governance structure and nature of the board.   For these reasons, the material omissions concerning corporate governance and litigation history constitute were crucial to the scheme of defraud.

97.   Item 11 requires that the franchisor disclose its obligations stated in the actual franchise agreement.[20]   Defendants falsely represented the obligations it would perform in terms of marketing and operational assistance.   Consistent with the earlier misrepresentations concerning 24/7 support, Defendants represented that they would "provide" marketing and operational support, including "samples of initial advertising and marketing materials," "[g]uidance in organizing your business," "reviews and analyses of your operations," and most notably could provide "periodic telephone and electronic mail assistance on daily operations, marketing, advertising, financial management, and other operating issues that you encounter." This array of promised assistance was never performed in a meaningful way.   For the reasons described above, these statements were material and knowingly or recklessly false when made and also formed a central component to the scheme to defraud.

98.   Item 19 governs the disclosure of financial performance representations.[21]   Here, Defendants included historic financial performance representations from Beavers in Chicago in Item 19.   Like their previous financial performance representations in the scheme to defraud, Defendants misrepresented that there was a "reasonable basis" for the representations, running afoul of the Franchise Rule.[22] In addition, a historic financial representation like Beavers contains "the implicit assumption . . . that a prospective franchisee may achieve at least the same level of performance" and, thus, any "[f]actors tending to call that implicit assumption into question must

---

[19] In addition, the inclusion of the identity of the directors under Item 2 triggers the obligation to disclose litigation under Item 3, which Defendants unlawfully avoided.

[20] 16 C.F.R. § 436.5(k).

[21] *Id.* at § 436.5(s).

[22] *Id.* at § 436.5(s)(1).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

be disclosed."[23]  Accordingly, the franchisor must disclose the material bases for the historical performance data.[24]  The Beavers historical financial performance representations violated the Franchise Rule and comprised part of the scheme to defraud for these on these grounds. The representations concealed several factors tending to call the implicit assumption of similar performance into question and failed to disclose the requisite "material bases" for the Beavers representation.[25]

99.    Contrary to the FDD's language in Item 19, Beavers' business operations were not "substantially similar" to a TDD franchise.  Among other material differences:

(a)    The Beavers territory is not limited to the zip-code based territories used in the TDD System.  Beavers territory encompasses the entire Chicago metropolitan area.[26] This dramatic and concealed difference renders a comparison unreasonable and calls into question whether a Beavers and TDD franchise could achieve at least the same level of financial performance.

(b)    Beavers started operations in 2012, meaning the data presented comes after three years of commercial operations and gaining experience.  Any comparison to a start-up franchise like TDD would be unreasonable.  This factor, which is also omitted, likewise calls into question whether a comparable performance could be possible.[27]

(c)    The FDD states that the Beavers income presented comes from three food trucks, a catering location, and a retail location.  However, TDD typically sold individual retail units (not a group of units like Beavers), with food trucks comprising substantially less than the 80%.  This difference in business models is an undisclosed factor that undermines the assumption that comparable performance is obtainable.

(d)    No information is provided on the geographic scope of the individual Beavers locations.  If one or more Beavers units were in a densely populated metropolitan areas like downtown Chicago, that circumstance could easily not exist at a different geographic location for a TDD franchise.  This calls into question whether a potential TDD franchisee could achieve at least the same level of performance.

---

[23] Franchise Rule Compliance Guide p. 90 (May 28, 2007).

[24] 16 C.F.R § 436.5(s)(3)(ii)(A).

[25] 16 C.F.R. § 436.5(s)(3)(ii).

[26] *Id.* at § 436.5(s)(3)(ii)(A), (F).  As disclosed in the 2019 FDD, "this franchisee operates a single, large TDD territory . . . "cover[ing] the greater Chicago area."  After three years of using Beavers data in Item 19, Defendants *completely removed* the financial performance information from 2019 FDD, effectively admitting that the Beavers data lacked a reasonable basis.

[27] *Id.*

Defendants failed to disclose the "characteristics of the [Beavers] outlets . . . that may materially differ from those" being offered by TDD.[28]

(e)     There is no information concerning customer demographics (*e.g.*, age, gender, family status, race, class status) and any relationship to sales, a particularly notable omission because food trucks can very their routes and locations are embedded within the community.[29]

(f)     There is no discussion of factors that could impact the overall level of demand or seasonal trends in demand for a Beavers location in Chicago compared to a hypothetical TDD location in a different city in a different part of the country.[30]

100.    In sum, Defendants knowingly misrepresented that the Item 19 Beavers financial representation possessed a reasonable basis and knowingly or recklessly concealed material factors that would tend to undermine the implicit assumption that a TDD franchise being offered for sale would perform at least as well as Beavers.[31]  For these reasons, it constitutes a part of the illegal scheme to defraud potential franchisees to invest in the TDD System.

        *ii.*     ***The January 1, 2018 and May 23, 2018 FDDs.***

101.    The January 1, 2018 TDD and May 23, 2018 FDDs also include a litany of material misrepresentations and omissions, demonstrating a continuous and related pattern of racketeering activities.  Given Defendants substantial experience in the franchise and food and beverage industries, they possessed significant knowledge of the Franchise Rule's disclosure requirements and relevant industry Guidelines.   Accordingly, the misstatements, half-truths, and material omissions made herein, were knowingly made or made with a conscious disregard for the truth.

102.    Because of their importance Brian Pappas (CEO), Jeffrey Pappas (COO), Publicover (CEO), Maple (Executive VP) and/or Moulton (Executive VP) developed and drafted, individually or collectively, the FDDs and distributed or caused to be distributed the FDDs to

---

[28] *Id.*

[29] *Id.* at § 436.5(s)(3)(ii)(F).

[30] *Id.*

[31] Finally, Item 19 gives the false impression that Defendants and TDD do not provide financial performance representations to prospective franchisees and class members.  Specifically, the 2016 FDD states that "[o]ther than [the Beavers] financial performance representations [in Item 19], we do not make any financial performance representations" and that any such occurrence should be reported to "management."  That representation is not only patently false in this FDD and in subsequent ones, as alleged above.

prospective investors for the purpose of inducing them to sign the uniform franchise agreement and invest in the TDD System. The January 1, 2018 TDD was sent by email at the direction of at least Jeffrey Pappas to TDD Houston on October 31, 2018. The May 23, 2018 TDD was sent by email at the direction of Jeffrey Pappas to TDD The Woodlands on October 31, 2018. It was also sent by email to Plaintiff TDD Garden City on June 6, 2017 by Jeffrey Pappas. In addition, prospective investors and class members received these versions until TDD was required to updated by law.[32]

103. Item 1. Just like the 2016 FDD, the 2018 FDDs have woeful deficiencies in their corporate governance disclosures. There is no mention of TDD Holding or TDD Fulton City LLC. Similarly, Defendants failed to disclose DFG Payroll, even though Defendants executed a related-party transaction involving almost $280,000 in payments to Brian Pappas and his family for "leasing" of their employment services back to TDD.[33] Brian Pappas's history of entering into such transactions further enhances the materiality of the omission and highlights the degree of willfulness.

104. Item 2. Defendants failed once more to identify the board of directors, completely abdicating its duty to provide corporate governance information. Similarly, Defendants continued to mislead prospective investors and class members, failing to fully disclose Jeffrey Pappas's work as a broker at B4K and that he participated in fraudulent related-party transactions.[34]

105. In addition, the two 2018 FDDs contain no discussion concerning the material change in the CEO position—that is, the departure of Brian Pappas from the CEO of TDD in 2017 and the installation of Publicover in that role shortly after.[35] Nonetheless, Defendants did not disclose Brian Pappas as has "management responsibility relating to the sale or operation of franchises offered by this document."[36] To the contrary, the franchise regulator for the State of

---

[32] *Id.* at § 436.7(a) (requiring annual update), § 436.7(b) (requiring quarterly update for disclosing material changes).

[33] *Id.* at § 436.5(a)(1), (7).

[34] *Id.* at § 436.5(b).

[35] *Id.*; *see also id.* at § 436.7(b) (requiring quarterly update for disclosing material changes in the franchise).

[36] *Id.*

41

1    Washington found that "Brian Pappas was still acting as a general manager for [TDD]. Brian

2    Pappas was a "consulting general manager" for DFG and a general manager of DFG Payroll

3    Company LLC, a subsidiary of DFG.  The State of Washington also found that Brian Pappas was

4    managing the [TDD] franchise marketing web portal, was directing leads to its independent

5    franchise brokers and otherwise involved in the marketing and operation of The Dapper Doughnut

6    franchises."[37]  For these reasons, Brian Pappas should have been disclosed under Item 2.

7         106.    Item 3 requires disclosure of fraudulent and franchise-related litigation of

8    individuals and entities that should have been disclosed in Items 2.  Specifically, a franchisor must

9    disclose to prospective investors, for each of the entities or individuals listed, or that should have

10   been listed, the following litigation proceedings:

11        107.    ***Pending Matters:*** All pending "administrative, criminal, or material civil action[s]

12   alleging a violation of a franchise, antitrust, or securities law, or alleging fraud, unfair or deceptive

13   practices, or comparable allegations." [38]

14        108.    ***Prior Ten Years.***  All "civil actions" where the individual was "held liable" for

15   conduct "involving an alleged violation of a franchise, antitrust, or securities law, or involving

16   allegations of fraud, unfair or deceptive practices, or comparable allegations," or where the

17   individual "is subject to a currently effective injunctive or restrictive order or decree resulting

18   from a pending or concluded action brought by a public agency and relating to the franchise or

19   to a Federal, State, or Canadian franchise, securities, antitrust, trade regulation, or trade practice

20   law."[39]

21

22

23   _____

[37] Statement of Charges and Notice of Intent to Enter Order to Cease and Desist, at ¶ 9, *In re Chicago*
24   *Doughnut Franchise Co., LLC d/b/a "The Dapper Doughnut," Brian Pappas, and Jeffrey Pappas*, (State
     of Wash. Dept. of Fin. Institutions Secs. Div. Apr. 6, 2020).

25   [38] 16 C.F.R.  §  436.5(c).   "For purposes of this section, 'franchise relationship' means contractual
     obligations . . . directly relating to the operation of the franchised business (such as royalty payment and
26   training obligations)." 16 C.F.R. § 436.5(c)(1)(ii).

27   [39] 16 C.F.R. § 436.5(c)(1)(i)-(iii) & (c)(2); *see also id.* at § 436.5(c)(3) (identifying details to disclose for
     each covered lawsuit). "'Held liable' means that, as a result of claims or counterclaims, the person must
28   pay money or other consideration, must reduce an indebtedness by the amount of an award, cannot enforce
     its rights, or must take action adverse to its interests." *Id.*

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

109.    Because Brian Papas should have been identified in the 2008 FDDs under Item 2, the following litigation proceedings involving him, the B4K franchise, and its parent company Creative Learning Corp. ("CLC") should have been disclosed under Item 3.  As previously noted, the FTC considers litigation disclosure an important tool to exposing fraud in the franchise industry and material.

110.    *First*, Defendants failed to disclose that the State of Virginia's regulatory body and B4K entered into a Settlement Order in June 2016, implicating Brian Pappas in fraudulent activities against franchisees.  The Virginia Commission determined, and B4K did not dispute, that following:

(a)    B4K provided most newly minted franchisees in Virginia **with financial representations that were contrary to those found in B4K's franchise disclosure document**—a practice Brian Pappas and Jeffrey Pappas repeated in the case of TDD.

(b)    B4K failed to disclose to prospective investors "**that only 12% of [its] franchises were profitable**" and, further, that it artificially inflated the revenues for B4K locations by including "revenue for school programs," despite that "**30-35% of schools within [B4K] franchise territories did not allow franchisees to conduct [such] programs**," which were "**often necessary for franchises to be profitable.**"

(c)    B4K had "**ma[de] untrue statements of a material fact or omitting a material fact necessary in order to avoid misleading**" representation to prospective investors "in connection with the sale or offer to sell a franchise."[40]

111.    *Second*, the Securities and Exchange Commission launched an investigation in 2015 concerning Brian Pappas's activities in connection with the B4K franchise and its parent company CLC, both of which he dominated and controlled as CEO of CLC.  That investigation unearthed evidence fraudulent acts and wrongdoing by Brian Pappas and resulted in B4K and CLC ousting Brian Pappas from his CEO position with the franchise in 2016.

112.    As a result, B4K and CLC sued Brian Pappas on June 23, 2016 for fraud, theft of company assets, and breach of fiduciary duty based on the evidence uncovered in the 2015 SEC investigation.  Among other things, the lawsuit maintained that Brian Pappas:

---

[40] *Commonwealth of Va., ex rel. State Corp. of Comm'n v. BFK Franchise Co., LLC*, Case No. SEC-2016-00025, at pp. 1-4 (Commonwealth of Va. State Corp. Comm'n May 16, 2016).

43

(a)     *Embezzled* more than a million dollars in company assets "*by falsely asserting that the funds were due under a contractual provision that Pappas knew had expired*." "[T]o *conceal the foregoing fraud scheme* Pappas made and caused to be made material false statements and material omissions . . . *to CLC independent directors as well as in CLC's filings with the [SEC]*."

(b)     "*Repeatedly engaged in self-dealing* and caus[ed] CLC to enter into several transactions with . . . several members of his family," including *$600,000 in sham* "*commissions*" *to Jeffrey Pappas*, transactions that "were *not* disclosed or approved by CLC's board of directors."

(c)     "*Committed fraud in relation to sales of [franchises] in Virginia and that thereafter caused an attempt to cover-up . . . by taking illegal actions*." A CLC employee expressly told Pappas that the un-registered sale at issue was illegal, but Brian Pappas proceeded anyway.

(d)     Failed to "*implement adequate internal financial and corporate controls, thereby concealing his . . . misconduct and permitting [him] to control and dominate CLC*." [41]

113.   ***Third***, Defendants failed to disclose that the SEC brought an action in August 2017 against Brian Pappas based in part on the same conduct. According to the SEC, Pappas operated a wide-ranging "fraudulent scheme" that "demonstrated a sweeping disregard for his responsibilities as a leader of a public company." The scheme included "misstatements and material omissions" [i] concerning non-disclosed "related-person transactions" with Jeffrey Pappas; [ii] that Brian Pappas failed to evaluate CLC's "internal controls over financial controls" and "disclosure controls and procedures," when under a clear obligation to do so; [iii] concerning Brian Pappas's non-disclosed personal bankruptcy; [iv] regarding Brian Pappas' misrepresentations in securities filings that his earlier Together Development Corporation franchise was "sold," when in fact it filed for bankruptcy.[42] The SEC further criticized Pappas for pilfering CLC by taking $1.52 million in compensation from 2010 through 2015, "[a]lthough

---

[41] Countercl., *FranVenturers, LLC v. Creative Learning Corp.*, Case No. CA 16-0236, pp. 1-4, 17, 21-26 (Cir. Ct. Seventh Dist., St. John's County). To further undermine corporate governance and to facilitate his fraud, Brian Pappas "did not cause CLC to hold even a single meeting of its board of directors, excluded other directors from decision-making, [and] caused the CLC board not to include independent directors. . . CLC also had no compensation committee or audit committee consisting of independent directors," even though his insider-directors "had inadequate background in finance and corporate affairs . . . to perform a reasonable check on [his] activities." *Id.*

[42] Compl. for Injunctive Relief and Other Relief, *United States Secs. & Exch. Comm'n v. Brian Pappas*, et al., Civ. Action No. 3:17-cv-954, at pp. 1-2, 6-12 (M.D. Fl. Aug. 21, 2017).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    at its peak [CLC] had only $4.4 million in assets." The SEC further maintained that Pappas

2    spearheaded an illegal CLC stock price manipulation scheme and violated SEC's proxy

3    solicitation rules by flagrantly failing to file an actual proxy statement when he attempted to retake

4    CLC.[43]

5         114.    The misrepresentations, half-truths, and material omissions in the 2008 FDDs

6    similarly play an integral role in the scheme to defraud prospective investors to sign uniform

7    franchise agreements.  Absent disclosure of a damaging pattern of fraud litigation in the FDDs,

8    class members would not have proceeded to sign franchise agreements.

9         115.    Item 11.    Defendants made the same or substantially similar marketing and

10   operational support representations.    TDD represented that would provide marketing and

11   operational support, including samples of initial advertising and marketing materials, advice

12   concerning construction and opening, guidance in organizing a franchise, business reviews and

13   analyses of operations, as well as could provide periodic telephone and electronic mail assistance

14   on daily operations, marketing, advertising, financial management, and other operating issues that

15   you encounter.    These representations were false for the same reasons that the 2016 FDD

16   representations were false when made and played an important role in the illegal scheme to

17   defraud.

18         116.    Item 19.    According to the Guidelines, "If the franchisor makes any financial

19   performance representation to prospective franchisees," at any point in the sales process, "the

20   franchisor must have a reasonable basis and written substantiation for the representation at the

21   time the representation is made and must state the representation in the Item 19 disclosure" such

22   that all prospective investors have equal access to the representation.[44]    Consistent with the

23   Guidelines, the Rule proscribes that "[f]inancial performance information that differs from that

24   included in Item 19 may be given only if: (1) a franchisor provides the actual records of an existing

25

26

27   ─────────────────

28   [43] *Id.* pp. 22-24.

     [44] Guidelines p. 58.

45

1    outlet you are considering buying; or (2) a franchisor supplements the information provided in

2    this Item 19."[45]

3         117.   First, Defendants transmitted the Auntie Anne's financial performance

4    representations to class members but omitted it in Item 19.  As previously noted, Auntie Anne's

5    financial performance representations lacked any reasonable basis or written substantiation.  For

6    these reasons, Defendants knowingly violated the Franchise Rule and deliberately fostered

7    confusion and misunderstanding on the part of potential investors and class members with respect

8    to the financial prospects of a TDD franchise.

9         118.   Second, Defendants transmitted the "healthy store" financial performance

10   representations and related representations to class members but omitted them in Item 19.  As

11   previously noted, the "healthy store" financial performance representations lacked any reasonable

12   basis or written substantiation.   Defendants knowingly violated the Franchise Rule and

13   deliberately fostered confusion and misunderstanding on the part of potential investors and class

14   members with respect to the financial prospects of a TDD franchise.[46]

15        119.   Lastly, the 2018 FDDs contain the same similar Beavers historical financial

16   performance representation to the 2016 FDD.  As explained above, these representations lacked a

17   reasonable basis and did not disclose factors that wound tend to undermine the assumption that a

18   TDD franchise would perform at least as well.  All these financial and material omissions and

19   misrepresentations represented predicate acts in the scheme to defraud.

20        *iii.*    ***April 10, 2019 FDD.***

21        120.   The 2019 FDD continued to perpetuate the anticompetitive racketeering activities.

22   The document contains material misrepresentations and omissions, many of which are the same

23   or very similar to misleading statements from the 2016 FDD and the two 2018 FDDs, highlighting

24   the continuity, relatedness, and pattern of the scheme to defraud.  Moreover, due to Defendants'

25   _____

26   [45] 16 C.F.R. § 436.5(s)(1), § 436.9(a), (c).

27   [46] *Id.* at § 436.5(s)(1).  The two FDDs in 2018 also falsely state that "[o]ther than these financial performance representations [in Item 19], we do not make any financial performance representations" and to report such representations to "management," *i.e.*, Jeffrey Pappas, who created of those

28   representations.  This representation was false when made and with the intent deceive and obscure the truth.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

substantial experience in the franchising and food and beverage industries, they possessed significant knowledge of the Franchise Rule's disclosure requirements and relevant industry Guidelines. Accordingly, the misstatements, half-truths and material omissions made herein, were knowingly made or made with a conscious disregard for the truth.

121.    Brian Pappas (CEO), Jeffrey Pappas (COO), Publicover (CEO), Maple (Executive VP) and/or Moulton (Executive VP) developed and drafted, individually or collectively, the 2019 FDD and distributed it or caused it to be distributed to prospective franchisees for the purpose of inducing them to sign the uniform franchise agreement and invest in the TDD System. Class members who invested in TDD in this time period would receive this FDD up until the issuance of an update required by law.[47]

122.    Item 1.  For the third time in a row Defendants did not reveal DFG Payroll Company LLC and the nature of its business.[48]  As explained above, this corporate governance related omission was material.

123.    Item 2.  Defendants omitted the identity any of TDD's directors, that Publicover has assumed the role of CEO of TDD, and that Brian Pappas had management responsibility relating to the sale or operation of franchises offered by TDD, and that COO Jeffrey Pappas had left the company because of fraudulent conduct.[49]  For the reasons explained above, these corporate governance related omissions were material.

124.    Item 3. Defendants omitted the prior franchise-related litigation concerning Brian Pappas and B4K and CLC franchises. They also failed to disclose that on November 11, 2018, the United States District Court for the Middle District of Florida entered final judgement against Brian Pappas, imposed civil penalties against him, and issued an injunction prohibiting him from engaging in the conduct alleged in the 2017 lawsuit.50  For the reasons explained above, these omissions were material.

---

[47] *Id.* at § 436.7(a) (annual update), § 436.7(b) (quarterly update for disclosing material changes).

[48] 16 C.F.R. § 436.5(a)(1), (7)

[49] *Id.* at § 436.5(b).

[50] *Id.* at § 436.5(c).

47

125.     Item 19.   Defendants continued to omit the Auntie Anne's and "healthy stores" financial performance representations, despite sending them to class members. As previously demonstrated, this omission violated the Franchise Rule and engendered confusion and misunderstanding on the part of class members with respect to the financial prospects of a TDD franchise, manifesting an intent to deceive.[51]

**C.     The Scheme to Defraud Successfully Induced Class Members to Sign the Uniform and Fraudulent Franchise Agreements, Laying the Groundwork for Their Financial Exploitation**

126.     Beginning in 2016, Defendants engaged in a continuous and inter-related scheme to defraud small business owners and working-class families into investing in the TDD System and franchises.  The consistent campaign of deception deployed during the recruitment phase— and expanded upon in the standardized FDDs—had its intended effect.  Eventually, class members were finally duped into executing franchise agreements, an integral component to the anticompetitive scheme to defraud and allowed Defendants to exploit Plaintiffs and class members.  Had class members known the truth concerning the marketing misrepresentations made beforehand and in the agreement itself, as well as the myriad material misrepresentations made before it (such as the cost representations), they would not have signed the agreement.

127.     Defendants' deception facilitated the growth of monopoly power with each class member entering into the fraudulent franchise agreement and thereby foregoing an alternative mini-donut franchising or distribution system.   After execution of the uniform franchise agreement, class members attended training days in Las Vegas.  Upon completion, class members returned to their designated territories and started building and opening their stores.  This involved class members paying substantial further sums of money to Defendants and other vendors.  According to TDD's corporate website, the up-front investment for a franchise retail unit run as high as $353,000—a materially underestimates amount.  Thereafter, Plaintiffs and class members had to pay monthly royalties, advertising and marketing expenses, and purchase reoccurring

---

[51] Item 20, Table 3 falsely represents that Beavers from Chicago, Illinois has only a single franchised unit, even though, as discussed above, it had five distinct locations (retail, catering, and three food trucks).  The January 2018 treated them similarly.  In contrast, as depicted in Exhibit I to the 2019 FDD, individuals owning multiple franchised units had each unit counted separately.

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

equipment and supplies from TDD, its exclusive suppliers, distributors, affiliates, and others, often at supra-competitive prices.

128.    As a result, class members' high investment costs and expenditures economically locked them into the TDD System, rendering them practically unable to switch to an alternative system without losing substantially all of their sunk investments.  The resulting lock-in of more class members to the TDD System facilitated TDD's market power and the ability to engage in anticompetitive conduct.  For instance, Defendants could *change* their initially expressed practices and procedures stated to class members before they signed their unform franchise agreement and became economically locked in and unfairly extract additional value from class members.  For example, Defendants represented that TDD would provide constant marketing support, but once the franchise agreement was signed, it could change its position and reveal it had no intention of providing that support.  Thus, it relieved its of that financial obligation and appropriated the value that class members had anticipated from the marketing support.  In addition, TDD could take advantage of the unduly generic and false cost estimates provided in the recruitment process and in the TDDs to raise prices on supplies, equipment, and other materials necessary to meet the TDD standard to a supra-competitive level, especially with respect to prices from approved and exclusive suppliers, *after the uniform agreement was signed and class members locked into the System*.

       i.     ***The franchise agreement was integral to the Defendants' anticompetitive conduct and the scheme to defraud.***

129.    Between 60 and 100 class members signed uniform franchise agreements with Defendants.  Because of its importance, Brian Pappas (CEO), Jeffrey Pappas (COO), Publicover (CEO), Maple (Executive VP) and/or Moulton (Executive VP) developed and drafted, individually or collectively, the franchise agreement and distributed it or caused it to be distributed to franchisees via e-mail during the relevant time period.[52]   The uniform franchise agreements

---

[52] On or about April 12, 2017, Plaintiff TDD Reno received a uniform franchise agreement from the Pappas Brothers by e-mail, which was executed on the same day.  On March 17, 2017, Jeffrey Pappas transmitted to Plaintiff TDD Dallas the uniform franchise agreement by e-mail, which was executed shortly thereafter. And in October 2018, the Pappas Brothers transmitted this document to TDD The Woodlands by email, who duly signed two days later.  Plaintiff TDD San Antonio was emailed a uniform franchise agreement for execution in or around June 2018 by Jeffrey Pappas, and it was executed that month.  Plaintiff TDD

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

misrepresented the nature of the assistance and support that would be provided from Defendants. The uniform franchise agreements transmitted to the entire class contained following material and misleading statements.  The franchise agreement and these provisions were sent with the intent to deceive, for the reasons discussed above.

130.    Section 7.1 represented that for the "Grand Opening" of each franchised store, "TDD will furnish advice and guidance to [franchisee] as to the grand opening marketing program."  This claim was false.  To the contrary, TDD never provided class members with guidance on any "grand opening marketing program."  No such document or plan ever existed, consistent with their inability to provide the marketing support, as previously promised.  Section 7.1 false and made knowingly or with reckless disregard for the truth.

131.    Section 10.1(i) stated that TDD would make provisions for "continuing assistance by telephone, electronic mail, voice mail, facsimile, mail, newsletters, or other methods that we, in our sole discretion, deem reasonable under the circumstance."  Here, Defendants regurgitated their false promise of "continuing assistance," but attempted sidestep their earlier promises with the spurious use of the phrase "in our sole discretion."  That was not what TDD and Defendants had represented before verbally and in the FDDs.  On this ground alone the statement fosters obfuscation, confusion, and represents nothing more than a naked attempt to deceive.

132.    TDD and Defendants had no intention of providing any type of "continuing assistance" to class members and did not, *because they had no discretion to do so*.  On paper, TDD faced serious financial challenges and could not afford what it had promised earlier.  The section misleadingly conveys that TDD and Defendants had any discretion at all on spending for "continuing assistance for class members."  As Defendants had knowledge of their own financial situation, the section was falsely or recklessly made for a second reason.

133.    Section 10.1(g) of the uniform franchise agreement represented that TDD would provide "samples of initial advertising and promotional materials and assistance in implementing an initial advertising and promotional program" in connection with the store launch.  As the story

---

Garden City received a uniform franchise agreement from Jeffrey Pappas in July 2018, and it was executed later that month.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

of Plaintiff TDD San Antonio illustrates, the advertising material available on Naranga were over a year old and outdated when Plaintiff TDD San Antonio commenced preparations to open its unit.    Similarly, TDD Houston's experience demonstrates that TDD and Defendants had no intention, lacking the financial wherewithal, to provide material launch support for class members. Simply put, no "initial advertising and promotional program existed."    The section was fraudulently or recklessly made for the purpose of misleading class members to believe the previously promised marketing and operational support would come to fruition.

134.    Section 10.1(l) claimed that TDD would provide "[g]uidance in initially organizing your business" and "reviews and analysis of [the franchise's] operations on any regular basis." These representations were fraudulent.  In keeping with its practice of not providing previously promised assistance and support, no independent guidance concerning how a franchise should "organize" its "business" ever occurred.  Just like the other broken promises, TDD and Defendants could not be bothered to conduct "on a regular basis" any operational review or analysis of a franchise.   For the reasons alleged above, these provisions were also false when made, and knowingly or recklessly made, as TDD and Defendants knew that they would provide no such assistance.

*ii.*    ***The Training Day misrepresentations lulled class members into a false belief in the strength of the franchise as part of the scheme to defraud.***

135.    After signing the uniform franchise agreement but before becoming fully invested in building their franchised unit, class members attended a week-long training session in Las Vegas, Nevada concerning starting and running a franchise in the TDD System. Much of the content concerned marketing issues.  At the training program, Defendants provided class members a grossly false impression about all the resources that would be deployed or at their disposal: marketing campaigns, marketing materials, wide-spread advertisement and brand awareness, catering contracts, support concerning the construction and design of their units, and 24/7 marketing and operational support.

136.    Defendants also provided fraudulent financial performance projections to the franchisees.  For instance, at the January 2019 training session in Las Vegas, Jeffrey Pappas and

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Morelle distributed to class members the TDD "healthy store" projections, which lacked a reasonable basis, were false and material, and made with the intent to deceive.

137.    Brian Pappas, Jeffrey Pappas, Maple, Morelle, and Ball were responsible for the content of and/or authored the training manuals and other materials used during the training sessions.  Defendants placed or caused to be placed the materially false presentations and franchise system manuals used during the training sessions onto Naranga, a corporate-provided Internet-based franchise management platform for all franchisees to access.  Publicover and Moulton routinely attended the training sessions and endorsed the presentations made by Defendants and TDD representatives.

138.    Consistent with prior representations, Jeffrey Pappas and Ball falsely presented the picture of 24/7 marketing assistance provided by TDD and Defendants.  Defendants represented that Ball would provide the franchise marketing functions at no extra fee through her outside consulting firm.  Ball and Jeffrey Pappas falsely trumpeted TDD's marketing capabilities by highlighting the specific types of tools and support it could and would provide on a continuous basis, including high-quality logos, social media headers, corporate Facebook ads, e-mail marketing templates, and sample press releases.  For example, in the opening marketing presentation Jeffrey Pappas falsely represented that "Corporate will be producing national videos" to help class members build social media campaigns around promotional videos.  Jeffrey Pappas and Ball further falsely represented that "The Corporate Media Marketing Team will have the update monthly e-newsletter content complete on the 15th of each month."  For social media, the Defendants claimed that "[t]he Corporate Marketing Team at The Dapper Doughnut will continue to update the manual with more advanced Facebook advertising tutorials."  Doubling down, they claimed that "Corporate will help provide high quality professional product images . . .  for you to use in [social media] campaigns."

139.    These statements were false when made.  Defendants never provided nor made available such marketing support on any consistent basis, and their failure to perform came on the heels of the training sessions, giving rise to an inference of fraud.  They likewise knew the representations were fraudulent or reckless because TDD's perilous financial situation indicated

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

it could not afford the heavy marketing support it was promising.  In fact, at one training day, after hearing the marketing presentation, Maple informed Publicover and Moulton that, overall, the franchise "was getting over its skis."

140.    Defendants' misrepresentations lulled Plaintiffs and class members into a false belief in the strength of the TDD System.  Indeed, they were made for the very purpose of inducing class members to remain in the TDD System.    Had the truth been told, Plaintiffs and class members would have sought to exit.

**D.    Defendants Expand the Scheme to Defraud to Lulling Class Members to Remain Within the TDD System, Although Some Begin to Suspect the Truth**

141.    Since the inception of the TDD franchise, Defendants provided essentially no marketing and operational support to the franchisees, leaving them hemorrhaging money and without any reasonable chance of success.  As one franchisee explained in an email to senior management, including Publicover, if a location called TDD or Defendants with "pleas" for the promised support, management would simply brush them off with statements like "we're working on it" or "it will be ready in a week or so."  Indicative of the falsity of those statements, the support never came.

142.    In early 2019, Jeffrey Pappas was terminated as TDD's COO on account of what Maple described to class members as "legal issues"—that is, his persistent fraudulent conduct.  As a result, Publicover took over the role of CEO of both DFG and TDD in 2019 and began hiring loyal colleagues from JumpSport to fill senior management roles, including Moulton and McKown.  The new leadership team understood the damage wrought by the Pappas Brothers and promised to make reparations.  They assured class members that material improvements would occur, including providing consistent marketing and operating support to increase franchisee sales as originally promised.  In reality, however, they provided minimal and useless assistance and gave the false impression of improvement.  Publicover developed the strategy to lull class members into thinking that the franchise may have turned the corner and to keep them within the TDD System.  Publicover caused this fraudulent and reckless plan to be implemented by Maple, Freeman, McKown, and Pappas.

143.    Starting in 2019, Defendants began to trickle out the deceptive marketing and operational support materials to lull class members into believing everything was on course.  For instance, Brian Pappas emailed class members a marketing update and survey, a "Spring Seasonal Calendar," and an update on new iced coffee beverages.  As another example, in 2020, McKown developed a half-baked new recipe guide, yet neglected to create critical components for its effective use, including "a costs of goods sold breakdown" and "a price break down."  These marginal efforts to keep their previous commitments were untimely, of dubious quality, and ultimately of little use.  Meanwhile, Defendants had bought themselves more time to collect ongoing royalties, sell additional franchises, and keep class members in the TDD System.

144.    In line with Publicover's strategy, starting in early 2019 Maple made telephone calls to class members to address the steep financial losses suffered and what corporate management could do to help going forward.  During these calls, Maple admitted the wrongdoings of TDD and Defendants Pappas Brothers and apologized to class members.  He further represented that other class members had similar tales of lies and deceit, but that he would never lie or repeat the misconduct.  Rather, Maple suggested it would take some time to clean up the mess from the Pappas Brothers and, at the same time, assured class members that new leadership would reboot and strengthen the franchise.  In August 2019, Maple e-mailed a lengthy memorandum to class members, with a copy to the Defendants, which included similar promises of success to come.

145.    As another example of lulling conduct, on October 15, 2019, Steven Moulton sent class members and Defendants an update on the corporate location at the MGM Grand Hotel in Las Vegas.  Moulton reported that the sole corporate franchise in the country was closing because it lost a catering contract.  Nonetheless, he optimistically claimed that TDD "remains committed to building a strong franchising organization with the tools needed to properly serve and support our franchisees.  Operating one or more TDD stores ourselves, as well as conducting catering, is an important part of that effort."  Building on this false theme, on December 6, 2019, Freeman and Morelle emailed the class emphasizing that corporate leadership was "creating a sustainable and exciting catering operation in Las Vegas," despite the recent closure and past failures in corporate stores.

146.    Further, in a widely distributed January 23, 2020 e-mail to class members and corporate leadership, McKown acknowledged problems in providing marketing support, yet claimed "we are actually getting a lot of things done and making good progress."[53]  In an e-mail to class members the very next day, Freeman echoed that "a lot has been accomplished over the last year."  On February 27, 2020, Freeman reassured class members over e-mail that "we have accomplished a lot in the last few months" in terms of operational support.  To bring the point home, on February 13, 2020; February 27, 2020; and March 18, 2020 Freeman and McKown held teleconferences with class members concerning the lack of marketing and operational assistance.  On those calls, Freeman and McKown falsely re-iterated Defendants' prior commitments of timely and meaningful support as part of the reboot of the franchise. Such conduct was intended to lull class members into remaining in the scheme to defraud.

147.    Contemporaneous evidence demonstrates, however, that class members had begun to discern that continued promises of operational and marketing support were made with an intent to deceive them.

148.    A January 23-24, 2020 e-mail exchange between TDD St. Louis and senior management documents the long-standing grievances and illustrates that the support representations and lulling statements were made with an intent to deceive.  In the exchange, Publicover declined a "long overdue" conference call with class members to discuss these matters, and TDD St. Louis confronted him and his "leadership" team for "allow[ing] this toxic environment to continue."

149.    TDD St. Louis further stated that Defendants had not been truthful in their dealings with class members.  TDD St. Louis noted that "corporate doesn't seem to really care.  No engagement to assist us, help review our revenue, the basics, etc.  That's why we signed onto a franchise.[54]  Furthermore, "[w]e've been told for months, years that the franchise is working hard

---

[53] In addition, on December 6, 2019, Freeman claimed by e-mail to class members and management to have *nearly* completed calculating the cost for producing each product in a new recipe book, something he promised to complete *months before*.  Even then, the costs sheets remained unfinished as of January 22, 2020.

[54] Emphasis in original.

55

and making things better, it's just not true.  We're tired of the lack of follow through, no communication, big promises, etc.  Ultimately, "[Publicover] and his leadership team could have fixed this long ago when the complaints started."  In short, "[t]his whole operation is a shame.  You say this leadership has the utmost integrity, [but] that's laughable."  In another note, TDD St. Louis lamented "this fraudulent franchise we bought into."

150.    Another franchisee, TDD Nixon, signed his e-mail of February 26, 2020 to class members and senior management from a "bankrupt franchisee," stating in the body of the communication that "[w]hat started out as [a] dream has become by nightmarish reality.  Transparency isn't important to this organization."

**E.     Defendants Collect the Scheme's Ill-Gotten Gains by Enforcing Royalty Rights Procured by Fraud and Securing Releases from Locked-In Class Members**

151.    A principal goal of the scheme to defraud involved obtaining contractual rights to royalty payments and other fees through the fraudulent execution of the uniform franchise agreement and using those fraudulent rights to obtain money.  Throughout the relevant time period, Defendants—in particular, Publicover, Moulton, and Morrell—engaged in conduct designed to achieve the objectives of the scheme to defraud class members.  Defendants sought to obtain, and in fact obtained, royalties and other payments from class members, where their purported right to such payment derived from the scheme to defraud and constituted ill-gotten gains.

152.    Upon opening their stores, class members were generally obligated to pay royalties to TDD. The uniform franchise agreement requires class member to pay (1) *the greater of* 5% of their gross sales per month or $1,000/month, in the first and second year; (2) *the greater of* 6% of their gross sales per month or $1,500/month, in the third year; and (3) *the greater of* 7% of their gross sales per month or $2,000/month, in the fourth year and onwards.  Initially, the amount owed was calculated by Defendants by using the sales data class members entered into the point-of-sale system at their stores and transmitted electronically to TDD and Defendants.  Defendants then automatically debited from each class members' bank account the amount of royalties owed using an electronic wire transfer.  This automatic royalty collection program was developed and carried

56

out by at least Brian Pappas, Publicover, Jeffrey Pappas, Maple, and Moulton and comprises part of the scheme to defraud.

153.     However, for some portion of 2019 and 2020, the automatic debiting program ceased operations.  Defendants, at the direction and planning of Publicover and Moulton, mailed or e-mailed class members demands for payment of the royalties due under the fraudulently procured franchise agreement.  For instance, on September 27, 2019 Maple wrote TDD Houston requesting three months of 5% royalties or $3,000, whichever larger, even though TDD had no contractual right at all to royalties because TDD Houston had not yet opened.

154.     In addition, on March 17, 2020, Morelle fraudulently demanded royalties that TDD was not entitled to under their franchise agreement from Plaintiff TDD San Antonio via e-mail, threatening termination of the franchise agreement and the loss of all of Plaintiff TDD San Antonio's investments in the franchise.  In the interim, Morelle electronically cut off Plaintiff TDD San Antonio's ability to purchase additional TDD-branded items and materials, even though the franchise agreement granted him no right to do so.  Ten days later, Morelle wrote TDD Houston demanding payment of $3,200 in fraudulent royalties.

155.     E-mailing all franchisees on April 1, 2020, McKown sought and did obtain fraudulently procured royalties from class members.  McKown stated that "[f]ranchisees who are not current on [their] royalties" must become "current" in two days or they will have their "Dapper Doughnut email address . . . shut down."  There is no provision in the uniform franchise agreement that affords TDD the right to terminate e-mail access on account of belated royalty payments.

156.     In order to achieve the goal of keeping their ill-gotten gains, Defendants have begun to obtain releases from class members for claims that may be asserted in this class action lawsuit, as a condition to the termination of the fraudulent franchise agreement.  For example, on April 22, 2020, Morelle and Moulton obtained an illegal and inoperative Termination and Mutual Release Agreement from Plaintiff TDD Reno that was in furtherance of, and incident to, an essential component of the scheme to defraud—retaining their ill-gotten gains.  In light of the scheme to defraud, Defendants simply cannot avoid liability by exchanging the ability to release

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

class members from the fraudulent and corrupt TDD System in exchange for a potentially applicable release.

**F.     Defendants' Scheme to Defraud Continues to Attempt to Ensnare More Victims to This Day**

157.    Defendants' scheme to defraud continues to mislead new franchisees through the gauntlet of the initial recruitment process, Discovery Day, inadequate FDDs, and training sessions to induce execution of the tainted franchise agreement and the expenditure of hundreds of thousands of dollars to which Defendants have no right.  The threat posed by this unremitting anticompetitive deception campaign must be stopped, and TDD's publicly available corporate website proves the point.  The operational managers of TDD, Freeman and Morrell, and TDD's CEO are responsible for the substance of the website and/or caused it to be published online.

158.    Just like the initial recruitment process, the TDD corporate website contains misrepresentations about TDD's profitability and financial success.  The website states that TDD has a "proven business model that is profitable."  To the contrary, well over a dozen corporate and class member franchisees have gone out of business after sustaining consistent losses and most, if not all, are far from realizing an overall profit.  For the same reason, the website's claim that the "franchise management team has developed a successful business model" is false.  Given the multiple years of financial losses suffered by the class members, including the closure of all corporate franchises for poor financial performance, these representations continued to be made with knowledge or conscious disregard of their falsity.

159.    Furthermore, just like the previously made marketing and support representations, the corporate website and an advertising webpage paid for by TDD clearly create the false impression that TDD will provide 24-7 marketing and operational support.   Among other misstatements, the websites represent that*:*

(a)     "***Our marketing and support team includes day-to-day operations assistance and ongoing support***."

(b)     TDD "***provides ongoing and operational support***."

(c)     TDD "provid[es] *a proven marketing package* [and] production and strategic assistance with your on-going local marketing efforts.  *All artwork, templates, ad layouts, etc. and a specific marketing plan are provided*."

(d)     "[M]arketing materials, software systems, expert support and other business tools" provided by TDD "will allow you to maximize the amount of time you spend in developing your business therefore ensuring success and profitability more quickly."

(e)     TDD provides "*comprehensive training and support*," including "*assistance with day-to-day operations*" and "*marketing support*."

160.    These marketing and operational support representations were false when made and continue to be false to this very day.  They were similarly made with an intent to deceive.  The scheme to defraud is not limited to completed misconduct but is a present and active artifice, solely intended to mislead new franchisees through the fraudulent scheme to induce the execution of the tainted franchise agreement and facilitate the expenditure of hundreds of thousands of dollars to which Defendants have no right.

**G.     Defendants' Racketeering Activities Caused Classwide Injury and Damages and Harmed Class Members and Competition**

*i.      The scheme to defraud caused classwide injury and damage.*

161.    Defendants' scheme to defraud class members caused injury and damages.  The underlying misrepresentations, half-truths, material omissions, and conduct directly caused class members to invest substantial sums of money in the fraudulent franchise system—costs averaging at least $500,000 per class member.  Plaintiffs and class members would not have incurred these expenses absent the scheme to defraud.  Among other things, these direct damages were associated with the construction and launch of the actual franchise unit, the purchase of manufacturing equipment, reoccurring capital costs, taxes, upfront franchise fees, reoccurring royalties, and marketing and advertising fees and expenses.  In addition, as a but-for and direct result of Defendants' illegal conduct, class members would have been in possession of the money that Defendants stolen and would have invested it in other profitable business ventures and opportunities.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

162.    All class members suffered these injuries and harms directly caused by Defendants because they were fraudulently induced to join and remain in the TDD System, which had the direct effect of economically locking them into that System.  In addition, other conduct, such as the collection of fraudulent royalties and claim releases, was used in furtherance of, or incident to, the scheme to defraud, which also directly impacted class members to their financial detriment.

163.    At minimum, the specific racketeering activity and predicate acts comprising the scheme to defraud that directly caused such injuries and damage to class members include the following:

(a)     The transmissions by mail or wire of pro forma recruitment and marketing e-mails sent by, or at the behest of, Brian Pappas and Jeffrey Pappas to prospective investors and class members containing misleading representations concerning profitability and costs enticing them to execute franchise agreements, as alleged in greater detail in paragraphs 61-64 and 67-74.

(b)     The transmissions by mail or wire of the fraudulent Auntie Anne's financial forecast for a prototypical TDD retail location sent by Jeffrey Pappas to prospective investors and class members for the purpose of inducing class members to sign franchise agreements, as alleged in greater detail in paragraphs 65-66 and 67-74.

(c)     The transmissions by mail or wire of the "healthy store" financial projections sent by Jeffrey Pappas and Morelle for a prototypical TDD retail store for the purpose of inducing class members to sign signing franchise agreements, and lulling class members into believing in the strength and viability of the TDD System, as alleged in greater detail in paragraphs 88-91, 67-74, and 141.

(d)     The transmission by mail or wire by Brian Pappas and Jeffrey Pappas of presentations and other documents misrepresenting their success and experience in the franchising and food and beverage industries, as alleged in greater detail in paragraphs 92-93.

(e)     The transmission by wire of the fraudulent presentations, marketing manuals, and other materials presented and/or used at the training sessions concerning marketing and operational support representations onto the electronic Naranga platform for class members by, or at the behest of, Brian Pappas, Jeffrey Pappas, Maple, and Morelle.  These transmissions misled and lulled class members into believing in the strength and viability of the TDD System such that class members would remain in it, as alleged in greater detail in paragraphs 75-87 and 140-145.

(f)     The transmissions by mail or wire by, or at the behest of, Jeffrey Pappas, Brian Pappas and/or Publicover, of the fraudulent July 2016 FDD to prospective investors and class members for the purpose of inducing them to sign franchise agreements, as alleged in greater detail in paragraphs 94-106 of the complaint.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

(g)    The transmissions by mail or wire by, or at the behest of, Jeffrey Pappas, Brian Pappas, Publicover, Maple, and Moulton of the fraudulent January 2018 FDD to prospective investors and class members for purposes of inducing them to sign franchise agreements, as alleged in greater detail in paragraphs 94-96 and 107-123.

(h)    The transmissions by mail or wire by, or at the behest of, Jeffrey Pappas, Brian Pappas, Publicover, Maple, and Moulton of the fraudulent May 2018 FDD to prospective investors and class members for the purpose of signing franchise agreements, as alleged in greater detail in paragraphs 94-96 and 107-123.

(i)    The transmissions by mail or wire by, or at the behest of, Jeffrey Pappas, Brian Pappas, Publicover, Maple, and Moulton of the fraudulent April 2019 FDD to prospective investors and class members for the purpose of inducing them to sign franchise agreements, as alleged in greater detail in paragraphs 94-96 and 124-29.

(j)    The transmissions by mail or wire by, or at the behest of, Jeffrey Pappas, Brian Pappas, Publicover, Maple, and Moulton to class members of the uniform and fraudulent franchise agreement, as alleged in greater detail in paragraphs 120, 133-139.

(k)    The transmissions by mail or wire beginning in April 2019 from Maple to class members that communicated that Jeffrey and Brian Pappas had defrauded class members.  In addition, Maple misleadingly represented that current TDD management would not engage in such practices going forward and would honor its prior commitments, as alleged in greater detail in paragraphs 70, 144, 149, of the complaint.

(l)    The transmissions by mail or wire made in 2019 and 2020 to class members by Maple, Brian Pappas, Freeman, Moulton, McKown, and Morell, made at the behest of Marc Publicover or others, giving the false impression of the financial and operational strength of the TDD System for the purpose of misleading class members to believe the System as a whole was strong and represented a financially viable business opportunity in order to induce them to remain in it, as alleged in greater detail in paragraphs 146-156.

(m)    The monthly use of the electronic wires by, or at the behest of, Brian Pappas, Jeffrey Pappas, Maple, Publicover, Morelle, and Mouton to debit monthly fraudulent royalty payments and other expenses from the bank accounts of the class members in order to achieve the ill-gotten gains from the scheme to defraud, as alleged in greater detail in paragraphs 157-158.

(n)    The transmissions by mail or wire of correspondence made for the purpose of collecting fraudulently obtained royalties or other payments made by, or at the behest of, Publicover, McKown, Moulton, and Morelle, as alleged in greater detail in paragraphs 159-161.

(o)    The use of the mails and wires to transmit Termination Agreements to class members from Morrell, Mouton, and Publicover containing release provisions, made in furtherance of an essential component of the scheme to defraud, as alleged in greater detail in paragraph 162.

(p)     The use of the wires to post the misleading corporate website www.dapperdoughnuts.com and other franchise marketing websites made by, or at the behest of, Freeman, Morelle, and Publicover, as alleged in greater detail in paragraphs 163-166.

ii.     ***TDD's attempt to monopolize mini donut stores harmed class members and otherwise harmed competition.***

164.    TDD, through its employees, officers, directors, affiliates, agents, and independent consultants, designed and executed an anticompetitive deception campaign that uniformly harmed all class members. Had they known the truth behind TDD's and its representatives' misrepresentations, Plaintiffs and class members would not have executed the franchise agreements. But, instead, class members entered into the franchise agreement under the false impression about TDD's policies and procedures, which when combined with the lock-in effect of the franchise exposed them to changes in TDD's purported policies and practices that resulted in anti-competitive consequences.

165.    For instance, the object of the campaign was to induce class members into the TDD system and not to provide marketing and support assistance that had been promised in the recruitment process, in the FDDs, and in the franchise agreement. After execution of the franchise agreement Defendants revealed that their marketing policies were false and deprived class members the marketing support needed to build their businesses. In addition, TDD took advantage of its unduly general, false, and unreliable estimates of the cost to build and operate a franchise unit, as well as the marginal costs to create the final products for sale, to later switch gears and charge supra-competitive prices on the purchase of mandated equipment and supplies from approved and exclusive vendors, both in terms of price and quality.

166.    TDD obtained market power over the class members that facilitated these anticompetitive acts due to the lock-in effects of joining a franchise system. As a result, the small business owners that comprise the classes became financially locked in to the TDD System and had little chance to escape without forfeiting their historical investments, even in the face of anti-competitive conduct. As remarked by Plaintiff TDD Reno, "I still believe they have done a lot of shady stuff and [they] don't seem to be willing to bend at all."

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

167.     Plaintiffs believe that, over the course of the relevant time period, TDD possessed at least 80% of the locations in the market.  In 2016, there were few, if any, high-end mini donut franchises.  Those market conditions essentially exist today, thereby corroborating that TDD had a dangerous probability of monopolizing the relevant.[55]

168.     TDD harmed competition in several respects.  First, TDD's deception campaign distorted choices and obscured the relative merits of alternative high-end mini donut franchises, preventing the efficient allocation of capital through the selection of preferred choices unfettered by fraud.  TDD denied class members the right to select a franchise system of their choice, untainted by its misconduct.

169.     Second, TDD harmed competition reducing the output of mini donuts—that is, Plaintiffs and class members would have been able to manufacture and sell more mini donuts to the public but-for the anticompetitive deception campaign.  Plaintiffs and class members were small business owners, the vast majority of whom had taken out substantial debt in order to build and operate a retail franchise that met the TDD standards.  Absent these substantial losses directly attributable to the anti-competitive deception campaign and its effects, Plaintiffs and class members would have increased the total output of mini donuts for consumers to purchase, a manifestly procompetitive outcome.

170.     Third, TDD reduced output and harmed competition through a second mechanism—charging or having its affiliates and/or exclusive or approved suppliers charge class members supra-competitive prices on supplies and equipment.  As a result of the deception campaign, TDD issued vague and inaccurate estimates in the recruitment process and the FDDs about the costs to open and operate a TDD franchise (including the marginal cost to produce a product for sale), but mandated class members purchase supplies and equipment that were sharply more expensive than competitive alternatives and often of inferior quality.  On information and belief, TDD and its affiliates received kickbacks or "commissions" from its approved or exclusive

---

[55] However, there are several alternatives to TDD, including the new franchise system Voodoo Donuts, branded chain operators like District Doughnut in the Washington, DC region, independently owned single stores, and purchasing a non-branded bundle of materials needed to make mini donuts from a supplier like Lil' Orbits.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

vendors, effectively raising the price for class members.  Because class members were forced to pay more for certain supplies and equipment than they would have absent the deception campaign, mini donut output was ultimately reduced, thereby harming competition.

## VII.   CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
#### Violation of 18 U.S.C. § 1962(c) (RICO Act)

171.   Plaintiffs hereby incorporate the allegations contained in the previous paragraphs as if fully set forth herein.

172.   Plaintiffs bring this cause of action against Defendants DFG, Brian Pappas, Jeffrey Pappas, Publicover, Maple, Morelle, Freeman, McKown, and Moulton.  These individuals and entities satisfy the "person" requirement for purposes of the RICO Act.

173.   The "enterprise" is TDD-that is, Chicago Doughnut Franchise Company LLC d/b/a/ The Dapper Doughnut, through which all the RICO Defendants conceived of and executed an unlawful artifice or scheme to defraud class members to their financial detriment.

174.   Beginning in 2016 and continuing to the present, Defendants executed an elaborate scheme to defraud working-class individuals and small business owners in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.  The scheme involved a continuous pattern of similar misrepresentations intended for the common purpose of defrauding class members into executing franchise agreements; economically locking class members into the TDD System through the substantial, irreversible investments; and misleading class members into remaining in the TDD System.

175.   This scheme to defraud is ongoing to this day by virtue of the similar misstatements found on TDD's corporate website.  For this reason, the pattern of racketeering is open-ended in nature and warrants injunctive relief.  It is also closed-ended in part to the extent that a class member closed its stores as a result of the scheme to defraud.  For the reasons alleged in Section VI.G, the pattern of racketeering activity undertaken by Defendants and alleged herein resulted in harm to the Plaintiffs and class members.

64

i. ***Defendant Brian Pappas.***

176.    Brian Pappas conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  As set forth in Figure 1, Brian Pappas was the CEO of TDD, held several other senior positions within TDD and DFG, and was involved in the operation and management of the enterprise.56 Brian Pappas directed TDD policy and business planning and participated in the resulting execution in matters such as financial performance misrepresentations, the substance of the fraudulent FDDs and the misleading franchise agreement, the "lulling" misrepresentations, and, most audaciously, the fraudulent scheme to hide himself from potential investors in DFG Payroll to avoid making unflattering (and legally required) litigation disclosures.  At all times, Brian Pappas has been within the chain of command of the enterprise and played a vital role.  Even after losing his CEO tile, the Washington State regulator found that he possessed substantial operational and managerial powers, warranting disclosure of his litigations concerning his fraudulent conduct in the franchise industry.57  During the relevant time period, Brian Pappas violated the federal mail and wire fraud statutes in a manner that constitutes a pattern of racketeering in violation of the RICO Act.  The scheme to defraud involved at least the following illegal acts as it pertains to Brian Pappas:

(a)    Made, or caused to be made, multiple misrepresentations, half-truths, and material omissions regarding financial performance representations, reasonably calculated to deceive class members into signing a uniform franchise agreement, as alleged in paragraphs 61-74 and 92-93.

(b)    Made, or caused to be made, multiple misrepresentations, half-truths, and material omissions in connection with distribution of FDDs, reasonably calculated to deceive class members into signing a franchise agreement, as alleged Section VI.B.

(c)    Distributed, or caused to be distributed, fraudulent franchise agreements, reasonably calculated to deceive class members into signing the agreement, as alleged in Section VI.C of the complaint.

---

56 *See supra* Section III.B.(1).

57 Statement of Charges and Notice of Intent to Enter Order to Cease and Desist, *In re Chicago Doughnut Franchise Co., LLC d/b/a "The Dapper Doughnut," Brian Pappas, and Jeffrey Pappas*, at ¶ 10, (State of Wash. Dept. of Fin. Institutions Secs. Division Apr. 6, 2020).  (Pappas had management responsibility over the "marketing web portal, . . . directing [franchisee] leads to its independent franchise brokers and otherwise [being] involved in the marketing and operations").

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

(d)     Made, or caused to be made, fraudulent marketing presentations, materials, and manuals used at training days, to be posted online on the TDD internal server Naranga, which were reasonably calculated to deceive class members into believing in the strength of the franchise and to remain within the TDD System, as alleged in paragraphs 140-145 and 75-87.

(e)     Made, or caused to be made, the electronic debiting of class members banking accounts to obtain fraudulently procured royalty rights and other improper charges, in furtherance of, or incident to, essential parts of the scheme, as alleged in paragraphs 157-158.

(f)     Made, or caused to be made, representations about the marketing and operational assistance provided by TDD to franchisees, reasonably calculated to lull and deceive class members into believing the franchise was strong and to remain in the TDD System, as alleged in paragraph 148.

177.    For the reasons explained in paragraphs 66-71, 74-87, 90-91, 93-95, and 157-158, Brian Pappas used mail and wires to make, or cause to be made, misrepresentations, half-truths, or material omissions alleged in the complaint with the intent to deceive.  He likewise used mail and wires to make, or cause to be made, statements in furtherance of or incident an essential component to the scheme to defraud.

### ii.     *Defendant Jeffrey Pappas.*

178.    Jeffrey Pappas conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  As depicted in Figure 1, he was the COO of TDD and held several senior executive positions within TDD and DFG, where he was directly involved in the operation and management of the enterprise and provided substantial direction in corporate strategy and planning, such as the development of the fraudulent FDDs and franchise agreement.  He also participated in the implementation for various matters, including but not limited to, financial performance misrepresentations and marketing and support misrepresentations, including Discovery Day.  In particular, Jeffrey Pappas, working in conjunction with Brian Pappas, designed and executed the franchisee recruitment process that first exposed class members to the scheme to defraud.  Until his dismissal in early 2019, Defendant Pappas was within the chain of command for the enterprise and played a vital role.

179.    Starting in 2016, Jeffrey Pappas ran afoul of the federal mail and wire fraud statutes.  These violations constitute a related and continuous pattern of predicate acts, which taken

66

together, illuminate the pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)  Made, or caused to be made, multiple misrepresentations, half-truths, and material omissions concerning financial performance representations, reasonably calculated to deceive class members into signing a uniform franchise agreement, as alleged in paragraphs 61-74 and 92-93.

(b)  Made, or caused to be made, multiple misrepresentations and material omissions in connection with distribution of the FDDs, reasonably calculated to deceive class members into signing a franchise agreement as alleged in Section VI.B.

(c)  Distributed, or caused to be distributed, fraudulent franchise agreements, reasonably calculated to deceive class members into signing the agreement, as alleged in Section VI.C.

(d)  Made, or caused to be made, fraudulent marketing presentations, materials, and manuals used at training days, to be posted online on the TDD internal server Naranga, which were reasonably calculated to deceive class members into believing in the strength of the franchise, as alleged in paragraphs 75-87 and 140-145.

(e)  Made, or caused to be made, the electronic debiting of class members banking accounts to obtain fraudulently procured royalty rights and other improper charges, in furtherance of, or incident to, essential parts of the scheme, in paragraphs 157-158.

180.  For the reasons explained in paragraphs 66-71, 74-87, 90-95, and 157-158, Jeffrey Pappas used the mails and wires to make, or caused to be made, the representations, half-truths, and material omissions as alleged in the complaint with the intent to deceive.  He likewise used the mail and wires to make, or caused to made, statements in furtherance of, or incident to, an essential component to the scheme to defraud.

iii.  ***Defendant Mark Publicover.***

181.  Mark Publicover conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  He is a "co-founder" and served as a "[p]rincipal" of TDD since its inception.  He has been the Chief Executive Officer of TDD and DFG and a director of DFG since 2017.  His substantial investment in TDD created the incentive for his direct involvement in the operation and management of the enterprise, including providing

substantial direction with corporate strategy and planning. Such high-level matters included the development of the fraudulent FDDs, the uniform franchise agreement, and the content of the corporate website, among other things. Publicover also participated in the implementation of that strategy and planning, which he delegated to Maple, Morelle, Freeman, McKown, Moulton, and others. Publicover received direct reports from his delegates about the fraudulent conduct of the Pappas Brothers and determined that the best strategy would be to continue making false marketing and operational representations, while simultaneously providing the bare minimum in assistance, in order to bilk fraudulent royalties and to obtain releases, where advantageous, from class members.

182.    Starting in 2016, Publicover ran afoul of the federal mail and wire fraud statutes. These violations constitute a related and continuous pattern of predicate acts, which taken together, illuminate a pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)    Made, or caused to be made, multiple misrepresentations and material omissions in connection in distributing FDDs, reasonably calculated to deceive class members into signing a franchise agreement, as alleged in Section VI.B.

(b)    Distributed, or caused to be distributed, fraudulent franchise agreements, reasonably calculated to deceive class members into signing the agreement, as alleged in Section IV.C of the complaint.

(c)    Made, or caused to be made, fraudulent statements concerning marketing and operational support that were reasonably calculated to mislead and lull class members into believing in the strength of the franchise and to remain within the TDD System, as alleged in Section VI.D.

(d)    Made, or caused to be made, the electronic debiting of class members banking accounts to obtain fraudulently procured royalty rights and other improper charges, as part of the scheme to defraud, as alleged in paragraphs 157-158.

(e)    Made, or caused to be made, transmission of correspondence to class members seeking and obtaining payment of fraudulently obtained royalties for the purpose of consummating part of the scheme to defraud, as alleged in paragraphs 159-161.

(f)    Transmitted, or caused to be transmitted, to class members documents containing release provisions potentially applicable to the claims asserted herein in order to retain ill-gotten gains, in furtherance of or incident to, an important component of the scheme to defraud, as alleged in paragraphs 162 and 168-169.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

183.    For the reasons explained in paragraphs 140-144, 146-162, and 166, Publicover used the mails and wires to make, or caused to be made, the above misrepresentations, half-truths, and material omissions alleged in the complaint with the intent to deceive.  He likewise used the mail and wires to make, or caused to made, statements in furtherance of, or incident to, an essential component to the scheme to defraud, as alleged above.

      *iv.*   ***Defendant Montiedell "Monty" Maple***

184.    Defendant Monty Maple conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  He served as the VP of Business Development of TDD and held other senior positions at DFG.  He was directly involved in the operation and management of the enterprise, including providing substantial direction in corporate strategy and planning, such as the development of the fraudulent FDDs and franchise agreement.  He also participated in implementing Publicover's "lulling" communications strategy and assumed the responsibilities of Jeffrey Pappas upon joining the enterprise.  At all times, he was within the chain of command for the franchise and played a vital role.

185.    Starting in 2016, Maple ran afoul of the federal mail and wire fraud statutes.  These violations comprise a related and continuous pattern of predicate acts, which taken together, illuminate a pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)    Made, or caused to be made, misrepresentations and material omissions in distributing FDDs, reasonably calculated to deceive class members into signing a franchise agreement, as alleged in Section VI.B.

(b)    Distributed, or caused to be distributed, fraudulent franchise agreements to class members, reasonably calculated to induce them to sign the agreement, as alleged in Section VI.C.

(c)    Made, or caused to be made, fraudulent statements concerning marketing and operational support, reasonably calculated to mislead and lull class members into believing in the strength of the franchise to remain within the TDD System, as alleged in Section VI.D and paragraphs 70, 147, and 149.

(d)    Made, or caused to be made, fraudulent marketing presentations, materials, and manuals used at training days to be posted online on the TDD internal server Naranga, which were reasonably calculated to deceive class members into believing in the strength of the franchise, as alleged 75-87 and 140-145.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

186.     For the reasons explained in paragraphs 70, 147, and 149, Maple used the mails and wires to make, or caused to be made, the above misrepresentations, half-truths, or omissions alleged in the complaint with the intent to deceive.

*v.*     ***Defendant Bryan Morelle.***

187.     Bryan Morelle conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  According to the April 2019 FDD, he is the "VP Operations and has been actively involved in all phases of store operations, franchise support, and training since June 2017."  He directly implemented Publicover's "lulling" program, continued the practice of making false financial performance representations, and was heavily involved in the collection of fraudulent royalties and securing releases, when advantageous, from class members.  At Publicover's direction, he and Freeman developed and launched the fraudulent corporate website and other marketing websites with misleading and ongoing statements about TDD.  At all times, he was within the chain of command for the enterprise and played a vital role.

188.     Starting in 2016, Morelle ran afoul of the federal mail and wire fraud statutes. These violations comprise a related and continuous pattern of predicate acts, which taken together, illuminates a pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)     Made, or caused to be made, multiple misrepresentations and material omissions regarding financial performance representations, reasonably calculated to deceive class members into signing a uniform franchise agreement and/or to lull class members into remaining with TDD, as alleged in Sections VI.A and VI.D.

(b)     Made, or caused to be made, fraudulent statements concerning marketing and operational support reasonably calculated to mislead and lull class members into believing in the strength of the franchise and to remain within the TDD System, as alleged in Section VI.D.

(c)      Made, or caused to be made, the electronic debiting of class members banking accounts to obtain fraudulently procured royalties and other improper charges, as part of the scheme to defraud, as alleged in paragraphs 157-158.

(d)     Made, or caused to be made, transmission of correspondence to class members seeking and obtaining payment of fraudulently obtained royalties as part of the scheme to defraud, as alleged in paragraphs 159-161.

(e)     Transmitted, or caused to be transmitted, documents containing release provisions potentially applicable to the claims asserted herein in order to retain ill-gotten

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

gains, in furtherance of, or incident to, the scheme's purpose, as alleged in paragraph 162 and 168-169.

189.    For the reasons explained in paragraphs 80, 86, 137, 141, and 152-153, Morelle used the mail and wires to make, or cause to be made, the above misrepresentations, half-truths, and material omissions alleged in the complaint with the intent to deceive.  He likewise sed the mail and wires to make, or cause to be made, statements in furtherance of or incident to an essential component to the scheme to defraud.

*vi.*    **_Defendant Mark Freeman._**

190.    Marc Freeman conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  He replaced Maple in mid-2019 as the General Manger of TDD, effectively taking responsibility for all aspects of the franchise system. He reported directly to Publicover and implemented the "lulling" program, interacting with class members frequently.  At Publicover's direction, he and Morelle developed and launched the fraudulent corporate website and other marketing websites with misleading and ongoing statements about TDD.  At all times, he was within the chain of command for the enterprise and played a vital role.

191.    Starting in 2016, Freeman ran afoul of the federal mail and wire fraud statutes. These violations comprise a related and continuous pattern of predicate acts, which taken together, illuminates a pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)    Made, or caused to be made, fraudulent statements concerning marketing and operational support, reasonably calculated to mislead and lull class members into believing in the strength of the franchise and to remain within the TDD System, as alleged in Section VI.D.

(b)    Made, or caused to be made, the fraudulent marketing, support, and other representations contained on TDD's website and other franchise marketing websites, as alleged in Section VI.F.

192.    For the reasons explained in paragraphs 85 and 150, Freeman used the mail and wires to make, or cause to be made, the above misrepresentations, half-truths, and material omissions alleged in the complaint with the intent to deceive.  He likewise used the mail and wires to make, or cause to be made, statements in furtherance of, or incident to, an essential component to the scheme to defraud.

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ⚜ CARANO

### vii.    *Defendant Ric McKown.*

193.    Ric McKown conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  He served as the head of product development at TDD and directly reported to Publicover.  In that role, he routinely interacted and communicated with franchisees, and as part of the "lulling program" misrepresented TDD's ability to provide consistent support and the degree of TDD's actual success.  At all times, he was within the chain of command for the enterprise and play a vital role.

194.    Since 2016, McKown ran afoul of the federal mail and wire fraud statutes.  These violations comprise a related and continuous pattern of predicate acts, which taken together, illuminates a pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)    Made, or caused to be made, fraudulent statements concerning marketing and operational support, reasonably calculated to mislead and lull class members into believing in the strength of the franchise to remain within the TDD System, as alleged in Section VI.D.

(b)    Transmitted, or caused to be transmitted, correspondence to class members seeking and obtaining payment of fraudulently obtained royalties for the purpose of consummating part of the scheme to defraud, as alleged in Section VI.E.

195.    For the reasons explained in paragraphs 85, 147, and 151, McKown used the mails and wires to make, or cause to be made, the above misrepresentations, half-truths, and material omissions alleged in the complaint with the intent to deceive.  He likewise used the mail or wires to make, or cause to be made, statements in furtherance of, or incident to, an essential component to the scheme to defraud.

### viii.    *Defendant Steven Moulton*

196.    Steven Moulton conducted or participated in the conduct of the enterprise's affairs and was employed by or affiliated with the enterprise.  He served as the Chief Legal Officer, Executive VP, and member of the board of directors of DFG.  He performed legal and business functions for TDD.  Moulton's financial investment in TDD and DFG provided him the incentive to have direct involvement in the operation and management of the enterprise, including providing substantial direction with corporate strategy and planning.  Such high-level matters included the development of the fraudulent FDDs and the uniform franchise agreement, the development of

the program to obtain fraudulent royalties and, where advantageous, obtain releases from class members.  Moulton personally implemented the royalty program and participated in the "lulling" program at times.  At all times, he was within the chain of command for the enterprise and played a vital role.

197.   Since 2016, Moulton ran afoul of the federal mail and wire fraud statutes.  These violations comprise a related and continuous pattern of predicate acts, which taken together, illuminate a pattern of racketeering in violation of the RICO Act, involving at least the following:

(a)   Made, or caused to be made, fraudulent statements concerning marketing and operational and financial performance support, reasonably calculated to mislead and lull class members into believing in the strength of the franchise and to remain within the TDD System, as alleged in Section VI.D.

(b)   Made, or caused to be made, the electronic debiting of class members banking accounts to obtain payment of fraudulently procured royalty rights and other improper charges, for purpose on consummating part of the scheme to defraud, as alleged in paragraphs 157-158.

(c)   Made, or caused to be made, transmission of correspondence to class members seeking and obtaining payment of fraudulently obtained royalties, as part of the scheme to defraud, as alleged in paragraphs 159-161.

(d)   Transmitted, or caused to be transmitted, documents containing release provisions potentially applicable to the claims asserted herein to retain ill-gotten gains, in furtherance of, and incident to, an essential component of the scheme to defraud, as alleged in paragraphs 162 and 168-169.

(e)    Made, or caused to be made, multiple misrepresentations and material omissions in connection with distributing FDDs, reasonably calculated to deceive class members into signing a franchise agreement, as alleged in Section VI.B.

(f)   Distributed, or caused to be distributed, fraudulent franchise agreements to class members, reasonably calculated to induce them to sign the agreement, as alleged in Section VI.C.

198.   For the reasons explained in paragraphs 110, 144, 150, and 152, Moulton used the mail and wires to make, or cause to be made, the above misrepresentations, half-truths, and material omissions alleged in the complaint with the intent to deceive.  He likewise used the mail or wires to make, or cause to be made, statements in furtherance of, or incident to, an essential component to the scheme to defraud.

*ix.*     **_DFG_**

199.    DFG is vicariously liable for the harm caused by the scheme to defraud on account of the racketeering conduct engaged in by its employees, officers, directors, and agents.  As shown in Figure 1, nearly all of the architects and senior managers of the scheme to defraud simultaneously held positions at DFG and engaged in the unlawful conduct while working in that capacity.  In addition, DFG benefited from the conduct of the Defendants in the form of receiving distributions from TDD.  Under these circumstances, imposing vicarious liability onto DFG is imperative by law and equity.

///

///

///

**SECOND CLAIM FOR RELIEF**
**Violation of 15 U.S.C. § 2 (Sherman Antitrust Act: Attempted Monopolization)**

200.    Plaintiffs incorporate by reference the above paragraphs as if fully stated herein.

201.    Plaintiffs bring this cause of action against TDD for attempted monopolization in violation of Section 2 of the Sherman Act.

202.    TDD, through its employees, officers, directors, affiliates, agents, and independent consultants, designed and executed an anticompetitive deception campaign that uniformly harmed all class members. Had they known the truth behind TDD's and its representatives' misrepresentations and omissions, Plaintiffs and class members would not have executed the franchise agreements.  But, instead, class members entered into the franchise agreement under a false impression about TDD's policies and procedures, which when combined with the lock-in effect of the franchise, exposed them to changes in TDD's purported policies that carried anti-competitive consequences.

203.    For example, one object of the campaign was to induce class members into the TDD system and not to provide marketing and support assistance that had been promised in recruitment process, in the FDDs, and in the franchise agreement, to the detriment of class members.  In addition, TDD took advantage of its unduly general, false, and unreliable estimates

McDONALD ⚫ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 ⚫ LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 ⚫ FAX 702.873.9966

of the cost to build and operate a franchised unit, as well as the marginal costs to create a product for sale, to later switch gears and charge supra-competitive prices on the purchase of mandated equipment and supplies from approved and exclusive vendors, both in terms of price and quality.

204.    TDD obtained market power over the class members that facilitated these anticompetitive acts due to the substantial costs of joining a franchise system.  As a result, the small business owners that comprise the classes asserted herein became financial locked in to the TDD System and had little chance to escape without forfeiting their historical investments, even in the face of anti-competitive conduct.

205.    There is no legitimate procompetitive justification for conducting a predatory and anticompetitive deception campaign, much less one to facilitate taking anticompetitive acts with TDD's purported policies and procedures.  At all relevant times, TDD had the purpose and intent to monopolize the market for mini doughnut stores, franchise systems, and other means of bringing the product to market.

206.    TDD possessed a dangerous probability of monopolizing this market given the lock-in effects associated with joining a franchising system.  In addition to its ability to achieve market power through lock-in, the goal of the branded TDD system was to "launch an aggressive national and international single and multi-unit owner franchise program."  The sales program would "target[] upscale, high volume malls [and commercial centers] in major cities across the U.S.," among other opportunities.  In 2016, TDD entered this nascent market, seeking to attract franchisees.

207.    A TDD franchise is not reasonably interchangeable or substitutable with the right to own and operate a traditional donut stores, including through franchises such as Duncan Donuts. Unlike traditional donut stores, the TDD System provided customers a "unique" and "high-end" product sold in an experiential setting where the customers watch the donut production process.58 Importantly, in contrast to Krispy Kreme, TDD markets and sells its mini donuts for dessert, not

---

58 In November 2019 Defendant Rick McKown articulates the placement of TDD in the broader universe of product offerings.  He explains that "[t]he *uniqueness* of TDD in the marketplace has been the *quality* of our *hot* and fresh doughnuts."  This "*continues to differentiate* TDD from other doughnut companies, [with] *upscale drizzles* continuing to position Dapper as *a unique provider of doughnuts and toppings*."

breakfast, and at prices that are at least three times higher on a per weight basis.  Indeed, the price of a Krispy Kreme donut does not constrain or limit the price of a TDD mini donut.  Put differently, the TDD System does not bother with donut prices at Krispy Kreme.  TDD's marketing materials and corporate website illustrate the degree of protection its System affords: that is, "limited competition."  "[W]hile there is a lot of competition for full-sized doughnuts that are made in the morning and sit on the shelf throughout the day, there is very limited competition for hot, fresh mini-doughnuts."

208.    Plaintiffs believe that, over the course of the relevant time period, TDD possessed at least 80% of the mini doughnut locations.  In 2016, there were few, if any, high-end branded mini donut franchises.  Those market conditions essentially exist today, thereby corroborating that TDD had a dangerous probability of monopolizing the relevant market.

209.    TDD harmed competition in several respects.  First, TDD's deception campaign distorted choices and obscured the relative merits of alternative high-end mini donut franchises and prevented the efficient allocation of capital through the selection of preferred choices unfettered by fraud.  TDD denied class members the right to select a franchise system of their choice, untainted by its misconduct.

210.    Second, TDD harmed competition by reducing the output of mini donuts—that is, Plaintiffs and class members would have been able to manufacture and sell more mini donuts to the public but-for the anticompetitive deception campaign and the attendant consequences. Plaintiffs and class members were small business owners, the vast majority of whom had taken out substantial debt in order to build and operate a retail franchise that met the TDD standards. Absent these substantial losses directly attributable to the anti-competitive deception campaign and its effects, Plaintiffs and class members would have increased the total output of mini donuts to purchase, a manifestly procompetitive outcome.

211.    Third, TDD reduced output and harmed competition through a second mechanism—charging or having its affiliates and/or exclusive or approved suppliers charge supra-competitive prices on required supplies and equipment.  As a result of the deception campaign, TDD issued vague and inaccurate estimates in the recruitment process and the FDDs about the

costs to open and operate a TDD franchise (including the marginal cost to produce a product for sale), but mandated class members purchase supplies and equipment that were sharply more expensive than competitive alternatives and often of inferior quality.  On information and belief, TDD and its affiliates received kickbacks or "commissions" from its approved or exclusive vendors, effectively raising the price for class members.  Because class members were forced to pay more for certain supplies and equipment than they would have absent the deception campaign, mini donut output was ultimately reduced, thereby harming competition.

212.    Plaintiffs and class members seek monetary damages for past injury and harm proximately caused by TDD's anticompetitive deception campaign.  Plaintiffs and class members also seek injunctive relief against TDD's ongoing deception campaign and a declaration that the uniform franchise agreement in place through the relevant time period is illegal and void in its entirety.  That agreement contained the marketing representation about TDD's policies that later were exposed as false and it further served as the lynchpin of the anticompetitive scheme and the resulting economic lock-in and harm to the class, consumers, and competition.  As alleged above, the anticompetitive deception campaign and uniform franchise agreement remain ongoing and pose an imminent risk to the class, consumers, and competition.

## THIRD CLAIM FOR RELIEF
### Violation of N.R.S. 598.0915(5) (DTPA)

213.    Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully stated herein. Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas, Publicover, Ball, Maple, Morelle, McKown, Freeman, and Moulton.

214.    As alleged in the complaint, Defendants, in the ordinary course of their business or occupation, engaged in deceptive trade practices by knowingly making false representations and omissions concerning the characteristics, uses, and benefits of purchasing the right to a TDD franchised unit and associated goods and services.  For instance, Defendants made material misrepresentations and omissions concerning financial performance and costs, and marketing and operational support for the class members, among other things. These misrepresentations and omissions are alleged and described in detail Section VI.

215.     These misrepresentations and omissions were made knowingly or recklessly, as explained in the Sections VI.A-D and F-G.  Among other things, the timing of Defendants' actions (or failures to act) were inconsistent with the representations that were made, giving rise to a plausible inference that the representations and omissions were fraudulently or recklessly made. At later dates, Defendants acknowledged the falsity of their conduct and further suggested that they knew of the true facts underlying the misrepresentations or omissions at the time they were made.

216.     These misrepresentations and material omissions proximately caused Plaintiffs and class members' injury and damages, as set forth in Section VI.G.  The representations and material omissions directly resulted in the Plaintiffs and class members entering into the uniform franchising agreement and remaining locked into a fraudulent franchising system, wherein they experienced severe economic losses and mental anguish.

217.     Plaintiffs have statutory standing to bring this claim because they are victims of consumer fraud and deceptive trade practices.  Any person who engages in a deceptive trade practice may be sued under the DTPA for that violation.

218.     The Injunction Class also seeks injunctive relief against Defendants to halt and subdue their ongoing and inter-related deceptive trade practices in violation of this provision and a corresponding declaration that that uniform franchise agreement in place throughout the relevant time period and in the immediate future is illegal and void in its entirety.  As alleged above, the deceptive trade practices and uniform franchise agreement remain ongoing and pose an imminent threat to the class and potential TDD investors.  The Court has the broad power to enjoin deceptive trade practices and impose "any equitable relief that the [it] deems appropriate," including voiding the franchise agreement.  See N.R.S. 41.600(3)(b).

219.     The entity Defendants are liable for the deceptive trade practices alleged herein because the individual Defendants were acting in their capacity as an employee and/or officer of the entity Defendants when they engaged in such practices to the benefit of TDD and DFG.  The entity Defendants financially benefited from the individual Defendants' conduct through the

McDONALD ⬨ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1   transmission of royalty fees, the sale of products to class members, and receipt of other fees.  For

2   these reasons, TDD and DFG are vicariously liable for the conduct of their officers and employees.

3                    **FOURTH CLAIM FOR RELIEF**
                  **Violation of N.R.S. 598.0915(7) (DTPA)**

4

5        220.    Plaintiffs incorporate by reference the above paragraphs as if fully stated herein.

6   Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas,

7   Publicover, Ball, Maple, McKown, Morelle, Freeman, and Moulton.

8        221.    Defendants, in the ordinary course of their business or occupation, represented that

9   goods or services for sale or lease—in particular, the right to own and operate a TDD franchise

10  and to purchase related goods and services—were of a particular standard, or quality, when they

11  knew or should have known that they were of a different standard, quality, or style.  Defendants

12  routinely made false representations and omissions about the standard and quality of the TDD

13  System and its related goods and services, including financial performance representations,

14  marketing and support representations, costs representations, and business success

15  representations.  These misrepresentations are alleged and described in Section VI.A-D, and F.

16       222.    As alleged in Sections VI.A-D and F-G, Defendants knew or should have known

17  that the TDD System and the related goods and services offered therein were of another standard,

18  quality, or style.  Among other things, the timing of Defendants' actions (or failures to act) was

19  inconsistent with the truth and provide a plausible inference that the Defendants knew or should

20  have known of the falsity of their representations when made.

21       223.    These misrepresentations in fact and material omissions proximately caused

22  Plaintiffs and the class members' injury and damages in the manner set forth in Count III.  As set

23  forth in Section VI.G, the representations directly resulted in the Plaintiffs and class members

24  entering into the uniform franchising agreement and remaining locked into a fraudulent

25  franchising system, wherein they experienced severe economic losses and mental anguish.

26       224.    Plaintiffs have statutory standing to bring this claim for the reasons explained in

27  Count III.  For the reasons explained therein, the entity Defendants are vicariously liable for the

28  conduct of their officers and employees named as individual Defendants in this Count.  In addition

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1 | to damages, Plaintiffs and class members seek injunctive relief as described in and for the reasons

2 | set forth in Count III.

3 | **FIFTH CLAIM FOR RELIEF**
**Violation of N.R.S. 598.0915(15) (DTPA)**

4 |

5 | 225.   Plaintiffs incorporate by reference the above paragraphs as if fully stated herein.

6 | Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas,

7 | Publicover, Ball, Maple, Morelle, and Moulton.

8 | 226.   Defendants, in the ordinary course of their business or occupation, knowingly

9 | made false representations, half-truths, and material omissions in a transaction, namely in

10 | connection with the recruitment, negotiation and execution of a uniform franchise agreement by

11 | class members to operate a TDD franchise unit and the continuous operation of that franchise

12 | pursuant to the that fraudulent agreement.  These false representations permeated all aspects of

13 | the TDD System, as described and alleged in detail in Sections VI.A-D and F-G.  These false

14 | representations were made knowingly for the reasons alleged therein.

15 | 227.   These misrepresentations and material omissions proximately caused Plaintiffs and

16 | the class members' injury and damages, as set forth in Section VI.G.  The representations directly

17 | resulted in the Plaintiffs and class members entering into the uniform franchising agreement and

18 | remaining locked into a fraudulent franchising system, wherein they experienced severe economic

19 | losses and mental anguish.

20 | 228.   Plaintiffs have statutory standing to bring this claim for the reasons explained in

21 | Count III.  For the reasons explained therein, the entity Defendants are vicariously liable for the

22 | conduct of their officers and employees named as individual Defendants.  In addition to damages,

23 | Plaintiffs and class members seek injunctive relief as described in Count III.

24 | **SIXTH CLAIM FOR RELIEF**
**Violation of N.R.S. 598.092(5)(b) (DTPA)**

25 |

26 | 229.   Plaintiffs incorporate by reference the above paragraphs as if fully stated herein.

27 | Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas,

28 | Publicover, Morelle, and Moulton.

230.    As shown and alleged in Section VI.A-B the complaint, Defendants advertised and offered an opportunity for investment in a TDD franchise unit and represented that the investment would earn a rate of return that they knew or had a reason to know was false or misleading. Defendants made numerous false financial performance representations during the recruitment process, Discovery Day, and in training sessions, as alleged in Sections VI.A-C.

231.    Defendants knew or had reason to know that the representations were false and misleading. As explained in Sections VI.A-C, Defendants mislead Plaintiffs and class members by making financial performance representations from non-comparable Beavers, a single Aunty Anne's franchise store, and from the "healthy store" representations that lacked a reasonable basis. Defendants knowingly mislead class members and were reckless regarding the truth of these representations. Indeed, based on Defendants' claims of decades of experience in the franchising and in food and beverage industries, they must have known that the representations, half-truths, and material omissions were fraudulent.

232.    These misrepresentations in fact proximately caused Plaintiffs and the class members' injury and damages, as set forth in Section VI.G. The misrepresentations, half-truths, and material omissions directly resulted in Plaintiffs and class members entering into the uniform franchising agreement and remaining locked into a fraudulent franchising system, wherein they experienced severe economic losses and mental anguish.

233.    Plaintiffs have statutory standing to bring this claim for the reasons explained in Count III. For the reasons explained Count III, the entity Defendants are vicariously liable for the conduct of their officers and employees named as individual Defendants therein. In addition to damages, Plaintiffs and class members seek injunctive relief as described in Count III.

**SEVENTH CLAIM FOR RELIEF**
**Violation of N.R.S. 598.092(5)(c) (DTPA)**

234.    Plaintiffs incorporate by reference the above paragraphs as if fully stated herein. Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas, Ball, Publicover, Morelle, Freeman, McKown, and Moulton.

235.     Defendants advertised and offered an opportunity for investment in a TDD franchise unit and, in doing so, made untrue statements, half-truths, and omissions of material fact that were necessary to make another statement, considering the circumstances under which the initial statement or omission was made, not misleading.  As alleged in Sections VI.A-D and F-G, Defendants made material misstatements and omissions in connection with the uniform FDDs and in the marginal cost projections, Annie Anne's projections, the TDD "healthy store" projections, and the Beavers historical performance data.  Further material misrepresentations concerned the amount and consistency of marketing and operational support.

236.     These misrepresentations in fact, half-truths, and material omissions proximately caused Plaintiffs and the class members' injury and damages.  As set forth in Section VI.G, the representations directly resulted in the Plaintiffs and class members entering into the uniform franchising agreement and remaining locked into a fraudulent franchising system, wherein they experienced severe economic losses and mental anguish.

237.     Plaintiffs have statutory standing to bring this claim for the reasons explained in Count III.  The entity Defendants are vicariously liable for the conduct of their officers and employees named as individual Defendants therein.  In addition to damages, Plaintiffs and class members seek injunctive relief against Defendants as alleged in Count III.  The sheer volume deceptive trade practices undertaken by Defendants increases the threat of further misconduct and the concomitant need and urgency for an injunction against the franchise agreement in its entirety.

**EIGHTH CLAIM FOR RELIEF**
**Violation of N.R.S. 598.092(5)(f) (DTPA)**

238.     Plaintiffs incorporate by reference the above paragraphs as if fully stated herein.  Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas, Publicover, Maple, and Moulton.

239.     Defendants advertised or offered an opportunity for investment in a TDD franchise unit and System and failed to comply with the laws and regulations concerning the marketing of franchising investments and the disclosures required to be provided to prospective investors.  In particular, Defendants developed and distributed FDDs that should have provided prospective

82

franchisees and investors with the material information necessary to make an informed decision about investing in the TDD System.  Those FDDs violated the Federal Trade Commission's Franchise Rule and the franchise laws of states that have authorized the regulation of franchises.

240.   As alleged and explained in detail in Section VI.B, Defendants violated the following franchise laws and regulations in connection with the distribution of at least four FDDs:

**Figure 9: Franchise Rule Violations**

| FDD | Statement or Omission (Item No.) | Legal Provision Violated |
|---|---|---|
| July 2016 | Non-disclosure of affiliate TDD Holding Company and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| July 2016 | Non-disclosure of affiliate DFG Payroll Company LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| July 2016 | Misleading and incomplete description of Jeffrey Pappas and his business history (Item 2) | 16 C.F.R. § 436.5(b) |
| July 2016 | Non-disclosure of TDD's directors (Item 2) | 16 C.F.R. § 436.5(b) |
| July 2016 | Misrepresentations regarding TDD's marketing and support assistance  (Item 11) | 16 C.F.R. § 436.5(k) |
| July 2016 | Beavers Historical Financial Performance Representations had reasonable basis (Item 19) | 16 C.F.R. § 436.5(s)(3) |
| July 2016 | Non-disclosure of material basis for Beavers Historical Financial Performance Representation and of factors tending to call comparison to TDD into question (Item 19) | 16 C.F.R. § 436.5(s)(3) |
| January 2018 | Non-disclosure of affiliate TDD Holding Company LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| January 2018 | Non-Disclosure of affiliate TDD Fulton Center LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| January 2018 | Non-disclosure of affiliate DFG Payroll Company LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| January 2018 | Non-disclosure of TDD's directors (Item 2) | 16 C.F.R. § 436.5(b) |
| January 2018 | Misleading and incomplete description of Jeffrey Pappas and his business history (Item 2) | 16 C.F.R. § 436.5(b) |

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

| January 2018 | Non-disclosure of CEO Mark Publicover (Item 2) | 16 C.F.R. § 436.5(b) |
|---|---|---|
| January 2018 | Non-disclosure of Brian Pappas as management with responsibility relating to sale or operation of franchise (Item 2) | 16 C.F.R. § 436.5(b) |
| January 2018 | Non-disclosure of pending SEC civil action alleging violations of securities law and alleging fraud (Item 3) | 16 C.F.R. § 436.5(c)(1)(i) |
| January 2018 | Non-disclosure of settlement decree with Virginia regulator re fraud in connection with sale of franchises (Item 3) | 16 C.F.R. § 436.5(c)(1)(iii) <br> 16 C.F.R. § 436.5(c)(2) |
| January 2018 | Non-disclosure of pending civil action alleging Brian Pappas engaged in fraud and deceptive practices          (Item 3) | 16 C.F.R. § 436.5(c)(1)(i) |
| January 2018 | Misrepresentations regarding TDD's marketing and support assistance (Item 11) | 16 C.F.R. § 436.5(k) |
| January 2018 | Distribute Auntie Anne's forecast, despite its inconsistency with the Beavers Financial Performance Representation  (Item 19) | 16 C.F.R. § 436.9(a) |
| January 2018 | Distribute Auntie Anne's forecast that lacked reasonable basis or substantiation and was not disclosed in Item 19 | 16 C.F.R. § 436.9(c) |
| January 2018 | Distribute "healthy store" forecast, despite its inconsistency with the Beavers Financial Performance Representation (Item 19) | 16 C.F.R. § 436.9(a) |
| January 2018 | Distribute "healthy store" forecast that lacked reasonable basis or substantiation and was not disclosed in Item 19 | 16 C.F.R. § 436.9(c) |
| January 2018 | Beavers Historical Financial Performance Representations had reasonable basis (Item 19) | 16 C.F.R. § 436.5(s)(3) |
| January 2018 | Non-disclosure of material basis for Beavers Historical Financial Performance Representation and of factors tending to call comparison to TDD into question (Item 19) | 16 C.F.R. § 436.5(s)(3) |
| May 2018 | Non-disclosure of affiliate TDD Holding Company LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| May 2018 | Non-Disclosure of affiliate TDD Fulton Center LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| May 2018 | Non-disclosure of affiliate DFG Payroll Company LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| May 2018 | Non-disclosure of TDD's directors (Item 2) | 16 C.F.R. § 436.5(b) |

McDONALD ⬥ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

| May 2018 | Misleading and incomplete description of Jeffrey Pappas and his business history (Item 2) | 16 C.F.R. § 436.5(b) |
|---|---|---|
| May 2018 | Non-disclosure of CEO Mark Publicover (Item 2) | 16 C.F.R. § 436.5(b) |
| May 2018 | Non-disclosure of Brian Pappas as management with responsibility relating to sale or operation of franchise (Item 2) | 16 C.F.R. § 436.5(b) |
| May 2018 | Non-disclosure of pending SEC civil action alleging violations of securities law and alleging fraud (Item 3) | 16 C.F.R. § 436.5(c)(1)(i) |
| May 2018 | Non-disclosure of settlement decree with Virginia regulator re fraud in connection with sale of franchises (Item 3) | 16 C.F.R. § 436.5(c)(1)(iii)<br><br>16 C.F.R. § 436.5(c)(2) |
| May 2018 | Non-disclosure of pending civil action alleging Brian Pappas engaged in fraud and deceptive practices (Item 3) | 16 C.F.R. § 436.5(c)(1)(i) |
| May 2018 | Misrepresentations regarding TDD's marketing and support assistance (Item 11) | 16 C.F.R. § 436.5(k) |
| May 2018 | Distribute Auntie Anne's forecast, despite its inconsistency with the Beavers Financial Performance Representation (Item 19) | 16 C.F.R. § 436.9(a) |
| May 2018 | Distribute Auntie Anne's forecast that lacked reasonable basis or substantiation and was not disclosed in Item 19 | 16 C.F.R. § 436.9(c) |
| May 2018 | Distribute "healthy store" forecast, despite its inconsistency with the Beavers Financial Performance Representation (Item 19) | 16 C.F.R. § 436.9(a) |
| May 2018 | Distribute "healthy store" forecast that lacked reasonable basis or substantiation and was not disclosed in Item 19 | 16 C.F.R. § 436.9(c) |
| May 2018 | Beavers Historical Financial Performance Representations had reasonable basis (Item 19) | 16 C.F.R. § 436.5(s)(3) |
| May 2018 | Non-disclosure of material basis for Beavers Historical Financial Performance Representation and of factors tending to call comparison to TDD into question (Item 19) | 16 C.F.R. § 436.5(s)(3) |
| April 2019 | Non-disclosure of affiliate DFG Payroll Company LLC and business history (Item 1) | 16 C.F.R. § 436.5(a)(1), (7) |
| May 2018 | Non-disclosure of TDD's directors (Item 2) | 16 C.F.R. § 436.5(b) |
| April 2019 | Non-disclosure of CEO Mark Publicover (Item 2) | 16 C.F.R. § 436.5(b) |
| April 2019 | Non-disclosure of Brian Pappas as management with responsibility relating to sale | 16 C.F.R. § 436.5(b) |

| | | |
|---|---|---|
| | or operation of franchise (Item 2) | |
| April 2019 | Non-disclosure of Brian Pappas as management with responsibility relating to sale or operation of franchise (Item 2) | 16 C.F.R. § 436.5(b) |
| April 2019 | Non-disclosure of pending SEC civil action alleging violations of securities law and alleging fraud (Item 3) | 16 C.F.R. § 436.5(c)(1)(i) |
| April 2019 | Non-disclosure of settlement decree with Virginia regulator re fraud in connection with sale of franchises (Item 3) | 16 C.F.R. § 436.5(c)(1)(iii) 16 C.F.R. § 436.5(c)(2) |
| April 2019 | Non-disclosure of pending civil action alleging Brian Pappas engaged in fraud and deceptive practices          (Item 3) | 16 C.F.R. § 436.5(c)(1)(i) |
| April 2019 | Non-Disclosure of SEC settlement decree in action involving violations of securities law and fraud (Item 3) | 16 C.F.R. § 436.5(c)(1)(iii) 16 C.F.R. § 436.5(c)(2) |
| April 2019 | Misrepresentations regarding TDD's marketing and support assistance (Item 11) | 16 C.F.R. § 436.5(k) |
| April 2019 | Distribute "health store" forecast that lacked reasonable basis or substantiation and was not disclosed in Item 19 | 16 C.F.R. § 436.9(c) |
| April 2019 | Distribute Auntie Anne's forecast that lacked reasonable basis or substantiation and was not disclosed in Item 19 | 16 C.F.R. § 436.9(c) |

241.    These violations of the law proximately caused Plaintiffs and the class members' injury and damages.  As set forth in Sections VI.B and VI.G, the representations and material omissions resulted in Plaintiffs and class members entering into the uniform franchise agreements and remaining locked into a deceptive franchising system, wherein they experienced severe economic losses and mental anguish to their detriment.

242.    Plaintiffs have statutory standing to bring this claim for the reasons explained in Count III.  In addition, Sections VI.B, Count I, and Count III detail the reasons why the entity Defendants are vicariously liable for the conduct of their officers and employees named as individual Defendants in this Count and who were closely involved in the development and dissemination of the FDDs.

243.    In addition to damages, Plaintiffs and class members seek injunctive relief against Defendants as described in Count III.   The sheer volume of deceptive trade practices undertaken by Defendants increases the need and urgency for an injunction against the franchise agreement in its entirety.

**NINTH CLAIM FOR RELIEF**
**Violation of N.R.S. 598.0923(2) (DTPA)**

244.    Plaintiffs incorporate by reference the above paragraphs as if fully stated herein. Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas, Ball, Morelle, Publicover, and Moulton.

245.    As alleged in Counts I-III, and VII, Defendants knowingly failed to disclose material facts in connection with the sale or lease of goods and services, including the sale of the right to operate a TDD franchise unit, to use TDD's trademark licenses, and the related purchase of goods and services (including their true cost).

246.    As explained in Sections VI.A-C and F-G of the complaint, these omissions are material because a reasonable person consider the information germane to his or her purchase of a TDD franchise and its attendant goods and services in determining whether to enter and remain in the uniform franchise agreement. As explained in the complaint, the material omissions were made knowingly or with a reckless disregard to the truth.

247.    These material omissions and proximately caused Plaintiffs and the class members' injury and damages, as set forth in Section VI.G.   The representations directly resulted in Plaintiffs and class members entering into the uniform franchising agreement and remaining locked into a fraudulent franchising system, wherein they experienced severe economic losses and mental anguish.

248.    Plaintiffs have statutory standing to bring this claim for the reasons explained in Count III.  In addition, Sections VI.B, Count I, and Count III detail the reasons why the entity Defendants are vicariously liable for the conduct of their officers and employees named as individual Defendants in this Count.

249.    As before, in addition to damages, Plaintiffs and class members seek injunctive relief as set forth in Count III.  The sheer volume of deceptive trade practices undertaken by Defendants increases the threat of harm and the need and urgency for an injunction against the franchise agreement in its entirety.

**TENTH CLAIM FOR RELIEF**
**Violation of N.R.S. 598.0923(3) (DTPA)**

250.    Plaintiffs incorporate by reference the above paragraphs as if fully stated herein. Plaintiffs bring this cause of action against Defendants TDD, DFG, Brian Pappas, Jeffrey Pappas, Publicover, Maple, and Moulton.

251.    As alleged in Figure 9 and Section VI.B, Defendants have violated federal or state laws or regulations relating to the sale or lease of goods or services, particularly violations of laws or regulations relating to the FDDs.

252.    Defendants knowingly violated the Franchise Rule for the reasons explained in Section IV.A-B.  Defendants have consistently touted their decades of combined experience in the franchising and food and beverage businesses, including holding senior management positions that would be responsible for developing FDDs.  Therefore, Defendants knew and reasonably understood the disclosure requirements contained in the FTC's Franchise Rule and other state laws.

253.    These violations proximately caused Plaintiffs and the class members' injury and damages, as set forth in Section VI.G of the complaint.  The violations resulted in the Plaintiffs and class members entering into the uniform franchise agreements and remaining locked into a fraudulent franchising system, wherein they experienced severe economic losses and mental anguish.

254.    Plaintiffs have statutory standing to bring this claim for the reasons explained in Count III.   In addition, Sections VI.B, Count I, and Count III detail the reasons why the entity Defendants are vicariously liable for the conduct of their officers and employees named as individual Defendants in this Count. In addition to damages, Plaintiffs and class members seek injunctive relief against Defendants as described in Count III of the complaint.

**ELEVENTH CLAIM FOR RELIEF**
**Equitable and Remedial Claim for Piercing the Corporate Veil**

255.    Plaintiffs incorporate by reference the above paragraphs as if fully stated herein. Plaintiffs bring this remedial and equitable claim based on the doctrine of piercing the corporate veil and its federal and common law analogues (including, in the alternative, a request for a declaratory judgement pursuant to 28 U.S.C. § 2201).  These remedial claims involve TDD, DFG, Publicover, Moulton, Jeffrey Pappas, and Brian Pappas in their capacity as directors and owners of TDD and/or DFG.59

256.    As alleged above, the inception and operation of TDD was for the sole purpose of executing a fraudulent, illegal, and continuous deception campaign against small business owners and class members.  The fact that Defendants grossly undercapitalized TDD since its inception such that it could not reasonably operate its business and perform its contractual obligations plausibly supports an inference of fraud.  TDD is also a wholly owned subsidiary of DFG.

257.    The structure of TDD and DFG corroborates the fraudulent nature of their activity. TDD was a mere shell corporation set up as a first line of defense to protect the assets of DFG and the assets of the owners of DFG from the fraudulent, illegal, and anticompetitive scheme and resulting liabilities of TDD.  In addition, DFG is a mere shell corporation set up as a second line of defense to protect the assets of its owners from the fraudulent, illegal, and anticompetitive scheme and any resulting liabilities.

258.    Furthermore, Defendants have exhibited absolute disregard for the separate identities of TDD and DFG, as exhibited by the unrestrained sharing of officers and directors among DFG and TDD, including Publicover's simultaneous and suspiciously parallel executive roles in both corporations.  See Figure 1.

259.    The existence and nature of DFG Payroll illustrates the absolute disregard for the separate identities of TDD and DFG.  DFG Payroll, at the direction of TDD, DFG, and the Defendant owners and/or directors, fraudulently concealed the work that Brian Pappas and others

---

59 Plaintiffs respectfully request this Court to disregard the corporate forms of TDD and DFG for the purpose of Counts II – X above.  For purposes of Count I, Plaintiffs respectfully request this Court disregard the corporate form of DFG.

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966
McDONALD CARANO

performed for TDD, painting the false impression they were not with TDD for the purpose of circumventing the FTC's disclosure obligations.  In return, at the direction of TDD, DFG, and the Defendant owners and/or directors, over $250,000 was siphoned from TDD and sent to DFG Payroll in the form of non-sensical "leased" employment services.  These facts, and the Pappas brothers' history of undisclosed related-party transactions, gives rise to the plausible inference that TDD, DFG, and their respective directors and/or owners co-mingled funds.

260.    Additionally, a substantial degree of injustice has been visited on class members by recognition of the corporate entities for DFG and TDD.  Plaintiffs and the class members have been duped into pouring their hard-earned life savings into a fraudulent and anticompetitive scheme, while the benefactors of the scheme simultaneously abused the corporate form to protect themselves from liability.  Publicover and other directors and investors have collected substantial amounts of money from Plaintiffs and the class members, as their franchisees fall by the wayside, drowning in debt and on the brink of bankruptcy.  At the same time, Defendants siphoned off funds from TDD to pay Brian Pappas and DFG Payroll to avoid disclosure of his history of fraudulent conduct in the franchise industry and benefited from the ill-gotten gains generated by the underlying wrongful conduct, as described in Section VI.E.

## VIII.   DEMAND FOR JURY TRIAL

261.    Plaintiffs hereby demand a trial by jury on all issues of fact to which they are entitled to a jury trial in this action.

## IX.    PRAYER

262.    Plaintiffs and class members respectfully request, on behalf of the putative class, that the Court enter final judgment in their favor and award them the following relief against TDD and the other Defendants:

(a) Preliminary and permanent injunctive relief against the uniform franchise agreement, including prohibiting the actual or potential enforcement of the agreement and a order or declaration that the agreement is illegal and unenforceable in its entirety;

McDONALD ⬥ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(b) Compensatory damages for injuries sustained as a result of Defendants' racketeering, anticompetitive, deceptive, or any other wrongful conduct, at least in the amount of $60 million dollars, including but not limited to, damages for out-of-pocked expenses incurred, lost business opportunities, the economic value of the promised marketing and operational support, and overcharges on various goods and services;

(c) Trebled damages, at least in the amount of $180,000,000;

(d) Punitive or exemplary damages in an amount to be determined at trial;

(e) Forfeiture or disgorgement in an amount to be determined by the Court at trial;

(f) Costs of court awarded by statute or otherwise;

(g) Reasonable and necessary attorney's fees;

(h) Reasonable and necessary litigation expenses;

(i) A finding that Plaintiffs and/or class members have pierced the corporate veil of TDD and/or DFG (and related doctrines) and that DFG and/or the owners of DFG and TDD are liable for the injuries and damages alleged herein; and

(j) Any relief in law or equity to which Plaintiffs and the class are entitled.

DATED: March 2, 2021                    McDONALD CARANO LLP


By: /s/ Laura Jacobsen
Laura R. Jacobsen, Esq. (NV Bar No. 13699)
100 W. Liberty Street, 10th Floor
Reno, Nevada 89501
ljacobsen@mcdonaldcarano.com

MAYER LLP
Jason C. McKenney, Esq. (TX Bar No. 240702450)
*Pro Hac Vice Application Forthcoming*
Kim Kearns, Esq. (TX Bar No. 24071217)
*Pro Hac Vice Application Forthcoming*
Mavish Bana, Esq. (TX Bar No. 24096653)
*Pro Hac Vice Application Forthcoming*
750 N. Saint Paul Street, Suite 700
Dallas, Texas 75201
jmckenney@mayerllp.com
mbana@mayerllp.com

*Attorneys for Plaintiffs*

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

4825-9747-4527, v. 1